### SHAFFER v. LETCHER et al.

No. 11717—Opinion Filed May 13, 1924.

**1. Fraud—Abuse of Confidential Relations.**

Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person availing himself of his position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation had existed.

**2. Joint Adventures—Abuse of Trust Relation—Compulsory Accounting.**

Where S., reposing confidence in the honesty, integrity, and business ability of L., intrusted him with a sum of money to be invested with a like sum of L.'s money in enterprises being promoted by L. and to be directed, controlled, and managed by him, and L., after a term of years of such control, without rendering any accounting and

without notice of his intentions so to do, asserts complete ownership in such enterprises to the exclusion of S., equity will decree a full and complete accounting of such trust and of the profits arising from the money so intrusted and invested.

(Syllabus by Ray, C.)

Commissioners' Opinion, Division No. 1.

Error from District Court, Tulsa County; George W. Clark, Assigned Judge.

Action by Mrs. Minerva Ann Shaffer against Fred R. Letcher and New York Oil Company. Judgment for defendants, and plaintiff appeals. Reversed and remanded.

Philip Kates, for plaintiff in error.

George S. Ramsey, Edgar A. DeMeules, Malcolm E. Rosser, and Villard Martin, for defendant in error.

Opinion by RAY, C. This is an action commenced September 6, 1919, by Minerva Ann Shaffer against Fred R. Letcher, in which she seeks to be decreed owner of one-half of the stock of the New York Oil Company, a corporation, or one-half of its tangible assets, and for an accounting. The defendant answered by general denial and pleaded the statute of limitations and an equitable estoppel because of laches on the part of plaintiff.

The transactions out of which this litigation arose were begun in March, 1907, and, according to the contention of the plaintiff, continued up until within a few weeks before the commencement of this suit in September, 1919, but, according to the contention of the defendant, terminated on the 29th day of December, 1909. Plaintiff contends, in substance, that in 1907 she and defendant entered upon a joint venture in the purchase, development, and sale of certain oil and town-site properties being promoted by defendant; that upon his representations that large sums of money could be made from such venture she advanced to defendant $20,000 to be by him invested in such enterprises, together with a like sum of his money, to be managed and controlled by him, and that he has so managed said business and enterprises as to exclude her therefrom and has refused to render an accounting. The defendant contends that she bought $20,000 par value of the Mid-Continent Townsite and Oil Company, of which he was manager, and that her status is that of any other stockholder. The defendant first became acquainted with the plaintiff and her daughter in January or February, 1907, when he accompanied his parents to visit them at their home in New Orleans, at which time he appears to have attracted Mrs. Shaffer's attention to certain oil and townsite enterprises which he was promoting, or intended to promote, in Oklahoma.

Immediately after the defendant returned to his home in Muskogee a correspondence grew between plaintiff and defendant as a result of which the plaintiff sent defendant $20,000 to invest in these oil and townsite properties. The plaintiff was at that time above 70 years of age and this was her first business venture. The evidence is confined largely to the deposition of the plaintiff, who by reason of her great age and physical infirmities was unable to attend the trial, the testimony of the defendant, and certain letters written by defendant to plaintiff. The letter from which the following is taken, appears to have been about the first in point of time contained in the record:

"* * * And you desire to place some money with our firm to invest in oil properties, we will even be more careful with it than we would with our own, and, I will say further, that we would place it in only our best propositions and where we, ourselves, would put in the same amount of our own money as we would of yours. * * *"

March 25, 1907, he wrote:

"Am having my attorneys get up our organization papers as I explained in last letter. Will have everything in 'ship shape.' Am always very particular to have everything just right. You need not worry about details. You know I have everything correct 'cause these properties are very valuable and it is only a little family affair.' Your money will be placed right with ours. * * *"

March 30, 1907:

"We will transfer the stock of all these companies over to the Mid-Continent Co. and put them all in safe deposit box here. Then we will issue you your $20,000.00 stock in the New Company (which controls all the others). * * *"

With this letter was enclosed an inventory of the properties of the company whose stock was to be transferred to the Mid-Continent Company:

"Muskogee, I. T. March 30, 1907. "Inventory.

"Memoranda of properties owned by the Mid-Continent Townsite and Oil Company Capital Stock $100,000.00, Fully Paid and Non-Assessable.

"Officers:

"Frederick R. Letcher, President, Vice-President; Orlando T. Letcher, Secy. and Treas.

"Directors. (5)

"Frederick R. Letcher, Inez M. Letcher, O. T. Letcher.

"Porum Townsite: One-half interest in 320 inside lots in original plat of Porum, Ind. Ter., based on prices made a year ago, when town was not half its present size                    $ 36,270.00

At present rate of increase in value these lots will bring          $ 60,000.00

"Letcher's Addition to Porum: 465 Lots in Letcher's Addition to Porum. Actual cost to us $12.00 per lot                           $  5,580.00

We are selling these lots at $50.00 each, or                     $ 23,250.00

"New York Oil Co. Oil Wells: One-half interest in properties of New York Oil Company, including four completed wells having output of over 2000 bbls. per day on Leo Bennet Excoe Lease. Room for four more wells on this one Lease. Refused offer of $110,-000.00 for this one lease        $ 50,000.00

We think this property worth  $100,000.00

Eight other leases owned by New York Oil Company,           $ 10,000.00

"Company Additional Lease: One of these (800 acres) adjoins oil farm south Muskogee, on which was drilled in a big well yesterday. This one lease is very valuable and we think could sell today for $50.00 per acre, or  $ 15,000.00

"Hartford Oil Company: One-half interest in six valuable Oil Leases owned by Hartford Oil Company. These have not been developed but some are located in proven territory near Glen Pool and are considered very valuable,  $ 10,000.00

"We will be disappointed if these don't bring us within two years                            $ 35,000.00

"Porum Coal Mining Co.: 320 acres valuable Coal Leases Adjoining Porum on South and North, which has been tested and 10 ft. coal found under it. Worth                            $  5,000.00

"When property is developed, this ought to bring          $ 25,000.00

"Drake Oil Co.: One-half interest in 1000 acres Oil & Gas Lease, of Drake Oil Company around Porum. These are undeveloped as yet. We put them in at actual cost,                 $  1,750.00

"Totals  $118,600.00  $258,250.00

"Note:

"By referring to the above figures and totals, it will be seen that (in merging these properties into the Mid-Continent Townsite & Oil Company for $100,000.00) we are listing them at less than they are worth in cash today. They cost $118,600.00 and we would not sell to out-siders for less than $258,250.00 today. Thus it will be seen that we have not inflated values and we confidently believe that every $1.00 worth of stock in our Company is worth $2.00 for $1.00 today."

April 3, in response to the above letter, Mrs. Shaffer sent defendant her draft for $20,000, upon receipt of which he sent the following letter:

"Your letter enclosing check properly indorsed just received upon my return from 'our oil field.'

"* * * I have placed all the securities representing the properties owned by our Company in a safe deposit box in the Canadian Valley Bank of this city. Have had my attorney get everything in perfect shape so that in case anything should ever happen to me your interests would always be protected. You own a portion of some of the best paying properties in the entire southwest and I am satisfied that you (or any member of your splendid family) will have reason to be proud of your investments. I think you or any of your friends will say after examining the statement that I sent you that you have certainly made a wise investment and that I have given you all the necessary papers."

Immediately upon receipt of the $20,000 he sent her a check for $416.66 which he called a dividend. He continued to send monthly checks called dividends amounting to an annual payment of 25 per cent. until the whole, including the $5,000 of December 19, 1909, amounted to $19,158.21. It is clear these monthly checks were not dividends earned but monthly payments to satisfy her that her money was earning large returns.

Until December, 1909, his letters to Mrs. Shaffer were addressed to "My dear partner" or "My dear friend and partner" and closed "your partner," or "your sincere friend and partner," but always recognizing her as his partner. There was no evidence offered even tending to show that he, at any time, ever notified Mrs. Shaffer that the partnership had terminated or that the stock in these several companies had not been transferred to the Mid-Continent Company as he represented to her in his letter of March 30, 1907, would be done or, as he wrote her in his letter of April 3, 1907, had been done. We think the evidence is conclusive that Mrs. Shaffer knew nothing

whatever of the business in which Letcher was engaged; that she had the utmost confidence in his integrity and ability, and relied solely upon his judgment and her confidence in him in placing the $20,000 with him for investment; that she was led to believe and did believe that she was placing this $20,000 to be placed with a like amount invested or to be invested by Letcher and that they were engaging in a joint venture to be directed and managed solely by Letcher.

After the advancement of the $20,000 by Mrs. Shaffer and the issuance to her of the $20,000 par value of stock of the Mid-Continent Company, the defendant adopted the following letter head in his correspondence with her:

"Mid-Continent Townsite & Oil Co.
"Capital Stock $100,000 Fully Paid.
"F. R. Letcher, President.
"O. T. Letcher, Secretary.
"Properties: New York Oil Co. of Mounds; Orient Oil Co. of Mounds; Letcher Oil Co. of Tulsa; Porum Oil Co. of Porum; Cherokee Townsite Co. of Porum; Canadian Valley Oil Co. of Porum."

The defendant said he never intended by this letter head to convey the impression that the Mid-Continent Company owned all these properties but to show the properties he was interested in. But we think this letter head used in correspondence with Mrs. Shaffer, considered in connection with his other representations, and the monthly checks that were being sent to her, was for the purpose of making her believe that she was interested in all these properties and hers was a paying investment in properties controlled by him, and that his judgment, business ability, and integrity could be relied upon.

In the letter of March 30, 1907, which was accompanied by a schedule of the properties claimed to be controlled by the defendant, he told the plaintiff that the stocks of all these companies representing these different properties were being transferred to the Mid-Continent Company, and, in substance, that these properties were to become the properties of the Mid-Continent Company, in which he proposed to place the money invested by the plaintiff, together with an equal amount of his own money. Upon that representation, together with other representations shown by the correspondence, the plaintiff sent him $20,000, for which he sent her shares in the Mid-Continent Company of the par value of $20,000. The only evidence as to what properties were actually put in the Mid-Continent Company is that of the defendant, and, from

his testimony, it is conclusive that the stock of these companies was never transferred to that company. He said that it was not done on advice of counsel. According to his testimony, what was done was to execute conveyances and assignments of the physical properties to the Mid-Continent Company, but their conveyances and assignments were never placed of record. Even the title to the several hundred town lots of the townsite of Porum and its additions were never placed on record but, so far as the record title was concerned, all the properties remained in the original companies and no notice of the change in policy and management from that represented to the plaintiff was ever at any time made known to her. The conclusion is irresistible that the plaintiff understood and believed, up until a few weeks before this action was commenced, that she was equally interested with the defendant in all of his oil ventures in connection with these companies. It is likewise clear from the defendant's testimony that he felt free at all times in the management of these different properties to transfer properties from one company to another at will. Following his detailed statement of companies organized for different purposes and the contracts entered into between these different companies, all managed by the defendant, and the shifting of properties from one to another, show that the interests of the plaintiff and defendant were practically inseparable. The evidence is convincing that the plaintiff from the beginning had an unbounded confidence in the integrity and business ability of the defendant, and, without any knowledge of the business whatever on her part, placed her money with him for his investment, control, and management on an equal basis, with a like sum to be invested by the defendant. That the defendant did not act in good faith with the plaintiff is conclusively shown by the undisputed testimony that he represented to her that he could buy a ¼ interest in the Orient Oil & Gas Company for $20,000 and induced her to furnish him $10,000 to be placed with $10,000 of his own money to buy that ¼ interest; that after receiving her $10,000 he represented to her that he had bought the ¼ interest for which he had paid $20,000, when he had actually bought the ¼ interest for $8,500. While it appears that that particular stock was afterwards given to her daughter, wife of the defendant, and is not here involved, it is a circumstance to be considered in connection with the other transactions to determine the good faith of the defendant.

In the fall of 1909, the defendant sold one producing lease, property of the New York Oil Company, for $48,000 and divided it one-half to the stockholders of the New York Oil Company and one-half to the Mid-Continent Company—and paid it to the stockholders as dividends. Of that sum he paid to the plaintiff on the 29th day of December, 1909, $5,000, making a total of all sums paid to the plaintiff $19,158.21. It is contended by the defendant that the $5,000 paid to the plaintiff December 29, 1909, was the last money paid to the plaintiff as dividends, and that the defendant at that time made a complete statement to the plaintiff of the state of their business affairs, which amounted to a notification to her that their business relations, at least so far as the property of the New York Oil Company was concerned, were terminated and that she so understood it, and that the statute of limitations began to run at that time, and the trial court apparently so held.

The only evidence tending to sustain this finding of the trial court is certain testimony of the defendant brought out by questions from the court as follows:

"The Court: Now, Mr. Letcher, after the change of plan of holding the properties there, did you acquaint Mrs. Shaffer with the change of plan in making the assignment of physical property rather than putting in the stock and if so, when and how and where?

"The Witness: Yes, sir; at the time I paid this $5,000 to her, I explained to her, to Mrs. Madison and Mrs. Shaffer, that as we sold these properties, we would divide the interest—divide the money according to the interests as they appeared and I explained to her that these properties that she was interested in, that we had executed assignments and deeds according to our attorney's advice and had placed them in a safe place for keeping and that they were there and the assignment as enumerated and the interests in the properties as enumerated in this inventory, which we sent to her, the interests were transferred in the form of assignments and deeds.

"The Court: Was that in the conversation at the Grunewald Hotel at New Orleans?

"The Witness: Yes, sir, in 1909, I think it was.

"The Court: What did Mrs. Shaffer say?

"The Witness: She said it was all right —that she was satisfied."

This testimony does not justify the conclusion that any frank and full statement of the business was made to the plaintiff,

or that she was told that she had no further interest in the New York Oil Company. This testimony of the defendant was in direct conflict with the testimony of the plaintiff, and in so far as the contention that it was understood between the parties at the time to be a closing of their business transactions, or any part thereof, it is conclusively disproven by the letters of the defendant to the plaintiff of February 28, 1910, October 28, 1911, November 8, 1911, and September 13, 1913. No money was paid from the defendant to the plaintiff after December, 1909, with the exception of $5,000 borrowed from her in 1911 and repaid in 1916, and $500 given her on her visit to Tulsa in 1916, which she understood to be a small advance on money coming to her, but which he testified was made as a loan.

From one letter bearing no date but clearly written after the $5,000 dividend of December 29, 1909, we take the following:

"* * * We all shared in a nice big dividend lately and Father and I don't need to draw out any money out of business and if you and Bessie can do likewise it will help me to carry out what I want to do in the way of developing our properties. I spoke to Bessie about this when I was down there. Conditions have improved so greatly and there is such a wonderful demand for oil that we should use every dollar we can rake and scrape in drilling more wells next few months. Don't you agree with me? Our new Lewis well No. 2 came in while I was away and it is best well on that lease. We are drilling No. 10, No. 11, and No. 12 on the Orient-Marshall. I think you will be more than pleased with the results in next few months. Don't you think my judgment is good in this matter? Of course, if I thought any of us needed the money I would not suggest it, but we just declared such a nice dividend and then we can put our earnings right back into best paying wells in United States, something that will bring in greater returns next year. Am I not right? * * *"

February 28, 1910, he wrote to Mrs. Shaffer as follows:

"Dear Mrs. Shaffer:

"My dear friend and partner:

"Your letter received few days ago. I am pleased that you agree with me. So long as you and Bessie and Father and I have plenty of money on hand and in as much as the $5,000.00 dividend declared, when I was down there, would pay several months in advance, of course, it is best to use most our income now in drilling more wells and developing our properties. I knew you would both agree with me because you are both splendid business women and you could readily see that it was much better

to use the money in developing our property, where it would later bring much better revenue, than to allow it to accumulate in banks where it would bring us practically nothing. * * *"

Again, on October 28, 1911:

"* * * I am doing everything possible to make some money so as to pay up what we owe; we are all needing some money and I want to see if I cannot make a nice big strike for all of us; rest assured that I am leaving nothing undone. * * *"

November 8, 1911, after defendant had married Mrs. Shaffer's daughter, in response to a telegram from Mrs. Shaffer that she would lend him $5,000, he said:

"* * * You are not only kind and generous but you are a good business woman. You understand more about business now than most any one else I know of, and you understand that there are times in the history of every business when a little money judiciously used means a world to that business and means great success.

"You know we all have large interests here and some very fine properties and you can readily see that a little money at this time means a great deal to our corporation and success.

"We have so much property and we have been very short of money trying to pay for those last wells we drilled, but we are getting our debts largely paid off and in so doing this we have used up our cash on hand and we needed a little money the worst way to aid in drilling a well or two on some of our new properties that are now looking good and by developing them now we can sell them for a large price and make some big money, so that you can see this means a good deal to all of us at this time, and I think I can safely say that it means more to us now than it has at any time in the history of our lives, for the reason that there are such splendid opportunities now for us to make big money by just having a little to use. * * *"

September 13, 1913, he wrote:

"* * * Have been working nights and days for a long time in my determination to make a success of our business. You have always been a great help to me and I'll never forget it. I've been trying so hard to open up a new field for us all. * * *"

March 16, 1911, in a letter to Mrs. Grandberry, daughter of the plaintiff, he said:

"* * * In regard to sending in your stock, that will not be necessary as I want to let you have an interest in this particular lease where the new well is and the stock that you have will show the interest. I will transfer this one lease to the Letcher Oil Company as the New York Oil Company has so many other leases. Your mama has

an equal interest in the Letcher Oil Company, same as in the New York and it makes it all the same. The stock is all in the family anyway."

The defendant's testimony was largely explanatory of these letters and his transactions and management of the different companies with which he was connected and acting as manager. He testified that in 1912 and 1913 practically all of the companies had been forced to "go out of business" or had become "inactive"; that in 1913 he was broke and went into the Newkirk oil field and made $30,000 in buying and selling leases; that at that time he and his mother owned all of the stock of the New York Oil Company, which had no assets, and that he put the $30,000 in the New York Oil Company, and had since that time operated through that company; that in 1917, at the death of his mother, he became the owner of all of the stock of that company. It appears that that is the only company with which he was connected which possessed assets of any value or, as the defendant termed it, that was not "inactive" at the commencement of this suit.

The defendants present their case under three propositions. We think the first and third propositions may be disposed of together:

"Proposition One.

"The decree is not contrary to the evidence.

"Proposition Three.

"The relief sought to be obtained by the plaintiff is that which accrues to her by virtue of her status as a stockholder in the Mid-Continent Townsite & Oil Company, a corporation.

"(a) That corporation is made neither plaintiff nor defendant. The plaintiff does not allege that she was a stockholder at the time of the bringing of the suit.

"(b) The petition alleges neither a demand made upon the corporation to bring the suit nor that such a demand would be vain or useless. The evidence does not show that plaintiff ever made such demand nor that such demand would have been vain or useless.

"(c) The suit is not brought by herself as a stockholder and for others similarly situated, but is brought in her own individual right and for her personal benefit. She cannot recover in this action.

"(d) The plaintiff was aware in December, 1909, of all the facts. The suit was not brought until September, 1919—nearly ten years thereafter. The suit is barred both by the statute of limitations and by

the doctrine of laches—both of which defenses were pleaded."

This suit, as we understand it, was not brought as a stockholder of the Mid-Continent Townsite and Oil Company, but was brought by Mrs. Shaffer in her individual capacity against the defendant, Fred Letcher, to recover for money advanced and intrusted to him for investment by him in different enterprises being promoted by him to be placed with an equal amount of his own money in such enterprises, to be controlled and managed by him and for an accounting, and the defendant, the New York Oil Company, was made a party because of his representation that the money so intrusted to him by the plaintiff would be and had been in part invested by him in the stock of the New York Oil Company, and that at the time the action was commenced the defendant, Letcher, was claiming to own all the stock of that company in which he claimed he put his own money, and which the plaintiff contends was money advanced and intrusted to Letcher for investment.

We think the decree was clearly contrary to the evidence unless it be that she cannot recover for the reason stated in the second proposition:

"Proposition Two.

"The decree of the lower court is correct for the reason that if all of the claims made by the plaintiff in error in his brief with reference to the ownership of the stock in New York Oil Company were true, conceding that the plaintiff below was entitled to maintain her suit on behalf of the corporation, yet, under the undisputed evidence in the case, there was nothing left for Letcher to account to the plaintiff for."

This presents the question here to be decided. Was there anything left for Letcher to account to the plaintiff for? If not, then the judgment should be affirmed. But will he be permitted to say that he went to the Newkirk field and made $30,000 and put into the New York Oil Company and thereby made it a prosperous and growing concern; that it is his own property and for that reason will not account to Mrs. Letcher for the money intrusted to him for his investment, where no accounting has ever been made or rendered of such investments? We think not. The relations existing between Letcher and Mrs. Shaffer had at all times been of a fiduciary nature. The evidence shows that the money was placed with Letcher completely on trust. While certain shares of stock were issued to her and so called dividends paid on it almost to the full par value, the selection and issuance of the stock was entirely at the election of Letcher. It is contended here, in substance, that with the dividends she received she was not greatly injured. But it must be presumed that Letcher received at least a like amount, and, therefore, cannot weigh in considering the question as to her right to an accounting.

We think the principles controlling in this case are correctly stated in Roby v. Colehour, 135 Ill. 337:

"The general principles universally recognized in matters of this character are well stated by Lord Chelmsford in Tate v. Williamson, L. R. 2 Chan. App. Cas. 55, as follows: 'The jurisdiction exercised by courts of equity over the dealings of persons standing in certain fiduciary relations has always been regarded as one of a most salutary description. The principles applicable to the more familiar relations of this character have been long settled by many well-known decisions, but the courts have always been careful not to fetter this useful jurisdiction by defining the exact limits of its exercise. Whenever two persons stand in such a relation that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person availing himself of this position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation had existed.'

"The relations to which these principles are applied are very numerous, and among those to which they are so applied by a substantial concurrence of all the authorities are those of attorney and client, trustee and cestui que trust, principal and agent, partners, and part owners of property. Willard's Eq. Juris. 170; 2 Pomeroy's Eq. Juris. sec. 955, et seq.; 1 Story's Eq. Juris, sec. 307, et seq.; Bispham's Eq. sec. 231, and authorities cited in notes. Indeed, as said by Mr. Pomeroy, 'It is settled by an overwhelming weight of authority, that the principle extends to every possible case in which a fiduciary relation exists in fact, in which there is confidence reposed on one side, and the resulting superiority and influence on the other. The relation and the duties involved in it need not be legal; it may be moral, social, domestic or merely personal.' 2 Pomeroy's Eq. Juris. sec. 956."

On glowing representations made by Letcher that large returns were to be had on money intrusted to him for investment with a like amount to be invested by him, Mrs. Shaffer placed her money with him with a trust and confidence almost childlike. If he has not used that confidence to her detriment and his gain circumstances

at least are against him. Without an accounting or in any way disengaging himself from that position of trust, he claims ownership of the only property now within his control and which he claims to be the fruits of his individual efforts separate and apart from the trust. We think such position is untenable. Equity will not permit him to cast off the trust at will and continue in the same enterprise with profit to himself and loss to her who believed, and had reason to believe, that her money was still invested with his in that enterprise and under his control and management. Equity will follow that trust fund in the hands of the defendant whether placed in the New York Oil Company or any other place and require an accounting.

It is contended that the plaintiff was guilty of such laches as will work an equitable estoppel. The evidence does not sustain such contention. The evidence of the plaintiff was that she had no knowledge that the defendant was claiming ownership of the different enterprises to her exclusion until a few weeks before commencement of the suit and she is sustained by the circumstances of the whole case.

We think the findings of the trial court were clearly against the weight of the evidence and the judgment should be reversed and remanded with directions to set aside the judgment and order an accounting, in accordance with the views here expressed, and to enter judgment in conformity to such accounting.

By the Court· It is so ordered.