## BRITISH AMERICAN OIL PRODUCING CO. v. MIDWAY OIL CO. et al.

No. 27738. July 5, 1938.

Rehearing Denied Sept. 27, 1938.

Application for Leave to File Second Petition for Rehearing Denied Oct. 11, 1938.

Hayes, Richardson, Shartel, Gilliland & Jordan, Everest, McKenzie & Gibbens, B. B. Blakeney, W. R. Wallace, and B. B. Blakeney, Jr., for plaintiff in error.

Keaton, Wells, Johnston & Barnes, M. D. Kirk, John H. Cantrell, Howard B. Hopps, and Gentry Lee, for defendants in error.

WELCH, J. The plaintiff, Midway Oil

Company, instituted this suit against the British American Oil Producing Company to recover an undivided one-half interest in two oil and gas leases described as the Piersol lease and the Russell Place lease. It was the theory of plaintiff, Midway, that the defendant, British American, held in said leases a one-half interest for itself, and a one-half interest in trust for Midway.

This contention was based upon a business relationship which was founded upon a contract between British American and the Victor Oil Company. The interest of Victor Oil Company, hereinafter called Victor, had been assigned to the plaintiff, Midway.

It was the contention of the defendant, British American, that it purchased the Piersol and Russell Place leases with its own funds, entirely separate and apart from its drilling contract with Victor, and that Midway had no interest whatever in those two leases.

The contract above referred to was reduced to writing at great length and need not be copied here. But a reference to the contract in the record discloses the following essential facts, viz.:

Victor owned a large number of oil leases covering numerous city lots and some unplatted territory in Oklahoma City. British American was in the oil production business, operating extensively in various fields in Oklahoma and elsewhere. Victor desired the drilling of oil wells on its leases and upon other leases which should be obtained in the same city blocks and territory, partly covered by the leases it already held. It being necessary, however, as to each city block affected, that leases be obtained on at least 51 per cent. of the lots in each block in order to obtain a city drilling permit. Victor and British American then contracted that Victor would assign British American a one-half interest in its leases for the drilling thereof. There were various provisions, not necessary to note here, in reference to examination and perfection of title and the like. The contract, by exhibit A attached thereto, listed the specific development area in which Victor then had leases and thereafter intended to procure other leases. There was also provision that Victor would procure other leases within that development area and execute assignments to British American so that the latter could obtain drilling permits and drill thereon. Thereafter it was agreed that British American

should aid in the purchase or acquiring of other leases in that development area, at the costs of Victor or Midway, to complete the required percentage in some of the blocks and drill, and British American did so. The result of the arrangement was that British American completed valuable oil wells on the land in this development area which were completed and operated for the joint benefit of British American and Midway as successor to Victor.

During the course of the development of the area covered by this contract, British American had out of its own funds purchased the Piersol and Russell Place leases involved in this action, and in due time also completed producing oil wells on those leases. The territory covered by the Piersol and Russell Place leases adjoins the territory specifically set out in exhibit A attached to the contract as being the specific development area covered by the contract between British American and Victor, but these leases are outside of and not included in the specific development area set out in exhibit A to the contract.

The theory of the plaintiff, Midway, is that the British American in developing the area specifically covered by the contract obtained information which induced it to place reliance upon the value of the Piersol and Russell Place leases, and to purchase the same, and that the business relationship at that time between the British American and Midway was such that it became and was the duty of British American to permit Midway to join in the purchase of these leases. Or that British American should be held to have acquired the Piersol and Russell Place leases one-half for British American and one-half for Midway. While it is the contention of British American, in effect, that it acquired the Piersol and Russell Place leases for its own use in its general oil production business as it acquired leases in various other oil fields, and that those leases had nothing whatever to do with its drilling contract in and upon the specified development area set out in detail in its contract with Victor.

The trial court found the facts in favor of plaintiff, and rendered judgment substantially as prayed for by plaintiff, and that judgment is here attacked as being contrary to the law and evidence.

The plaintiff places some reliance upon the recent decision of the Court of Civil Appeals of Texas in Whatley v. Cato Oil Company reported in 115 S. W.2d 1205. This decision is referred to as being square-

ly in point on both the facts and the law. The facts there were similar in that Cato was employed by contract for an interest to drill a well on certain leased premises, and thereafter, upon information received in that development, he purchased for his private interest a nearby lease. In that case it was held by inference that this other lease was purchased and held for the joint interest, as plaintiff contends should be applied to the Piersol and Russell Place leases here. However, in that case the contract specifically provided that all information belonging to or subsequently acquired in the drilling and development should be used for the mutual benefit of the parties of said joint adventure. This is shown by a quotation of the contract in that opinion. Although the contract in this case is written at length, with many detail provisions, there is no provision in this contract that any information obtained by British American in drilling or in completing the lease blocks, or any information obtained by Victor or its successor, Midway, in completing the lease blocks, should be used for mutual benefits. In the Whatley-Cato Case the trial court sustained a demurrer to plaintiff's petition. In reversing that judgment the appellate court noted that the contract sued upon provided, among other things, for the operation to be carried out "in good faith for the joint benefit of the coadventurers and to use all information had and acquired by such enterprise, for the mutual benefit of the members thereof," and concluded that in view of these and other allegations, the petition did state a cause of action. It seems apparent that the petition in that case, upon this point, sufficiently alleged that the Cato Oil Company in drilling the premises obtained information which, in direct violation of the specific provisions of the contract, it used for its own benefit exclusive of the benefit of the other party. Since no such provision is contained in this contract, it seems apparent that the case is not squarely in point as the plaintiff asserts.

From a careful reading, the contract here involved creates nothing more nor less than an arrangement by which British American on the one hand, and Victor and Midway, on the other hand, should jointly share in the profits from the development of a specific development area, the leases to be provided by Victor, and the premises to be diligently and properly drilled and operated by British American for the two of them, with detailed provision as to time and method of drilling, providing for the operating expenses to be charged by British American, with detailed provision for acquiring, at Victor's cost, other leases for the joint account, but the procuring of other leases for the joint account was specifically limited to the specified development area referred to in the contract and set out in detail in exhibit A, which was attached to and made a part of the contract. Under that contract, leases procured within that specified development area, if procured by Victor or thereafter by British American, were to be at the cost of Victor or Midway and held for the joint benefit. Leases therein procured by Victor or Midway were held for the joint benefit, and leases procured therein by British American were held for the joint benefit. There was no violation by either party on that point, and it seems clear that if either party had procured a lease in the specified area, it could not have been successfully held privately and exclusively from the other.

However, we find nothing in the contract that would prevent either party from acting outside of the area for his own benefit, even though influenced in such action by information obtained within the specified area. That is, if Victor or Midway had obtained information in the area which induced it to sell formerly owned leases outside of the area, or to purchase additional leases outside of the area, there was no contractual obligation that it should share the profits from any such transaction with British American. Or, upon the other hand, if British American had obtained information in the area which induced it to sell formerly owned territory outside of the area, or purchase additional territory outside of the area in the conduct of its general oil production business, it would be under no contractual duty to share the profits of any such transaction with Midway. It is indicated that Victor and Midway and those in charge of the affairs of these corporations were probably extensively engaged in business elsewhere, and that the British American is extensively engaged outside this specified area and elsewhere in the oil production business. It may have been that neither of the parties would have been willing to contract as to the perpetual mutual use of all information that might be traceable to the acquiring and developing of the leases in this specified development area. It is conceivable that information obtained from the development of this specified area might have been valuable to

one party, or to the other, in some business transaction far removed from this specific development area, so that neither would have been willing to contract without restriction for the continued mutual use of information so obtained. At any rate, whether the parties would or would not have been willing to be bound to such mutual use of information by contract, they did not so contract in this case. Had they desired to so be bound, and to so bind each other, they might at least have undertaken to do so by some expression in the contract. There is no such expression. It is a matter of common knowledge that a great many contracts are made by which a leaseholder contracts with an oil company to drill a well on his lease for the mutual benefit of the contracting parties. While such contracts might provide that neither party could thereafter obtain other leases privately or make private use of information, they did not do so, and there is no requirement of law that such provision be contained in such a contract. The oil field in and about Oklahoma City is highly developed; the wells in many instances are on adjoining blocks and in many instances in close proximity to each other. It must often happen that an oil company in drilling on one block, even on contract to drill for mutual benefit with a leaseholder, would obtain information of great value in the drilling or operation of its other wells in the Oklahoma City oil fields. In such case there would be no duty to pay the leaseholder one-half of the value of such information, or to in any manner share it, unless there were some contractual or legal obligation to do so. In the case of the ordinary contract to drill and develop an oil lease for mutual benefit, the drilling party has fully discharged his obligation when he has diligently and properly accounted to the leaseholder for his share. All that was done in this case by the British American, and it is not contended that any duty to Midway was violated except as to those outside leases here involved.

The contract involved in this action, in considerable detail, sets out the mutual rights, liabilities, and duties of the parties, one to the other. It is clearly apparent that the contract does not bind either party in any way as to any territory or transaction outside of the specified development area, and that the contract cannot be so construed as to hold and bind British American in the manner which Midway here seeks to hold British American.

It must have been the conclusion of the trial court that these parties under this contract were acting together somewhat as general partners, giving all of their time and efforts to the affairs of the partnership. Such a view was clearly erroneous. After Victor or Midway completed assembling the lease blocks and assigned the leases to British American, then Midway had nothing further directly to do with the transaction or the matter. And aside from aiding in procuring leases to fill in blocks, the British American had only to complete the drilling and development and to carry on the operations of the wells and account to Midway according to the terms of the contract. Neither owed any further duty to the other. And each, after discharging such contractual duty to the other, was free to carry on in any other or similar enterprise elsewhere.

British American profited substantially from its contract with Victor and Midway. A sense of appreciation might have prompted British American, when contemplating the purchase of the Piersol and Russell Place leases, to give Midway an opportunity to join therein and take one-half of the chance of loss or one-half of the chance of profit on those leases. But the question we are called on to answer is whether British American, after purchasing those leases and developing the same to great value, shall be required to turn over to Midway one-half of the profits therefrom. This cannot be required by the courts, unless there is a clear duty upon British American to do so, and a clear right upon the part of Midway to receive the same. In fine, the question presented is one of law. And by application of the law to the facts and to the judgment, we must say whether the trial court erred in holding British American to a greater duty, and in according to Midway a greater right, than could be based upon their contract, or some part or portion thereof.

The plaintiff discusses at length the rules applicable to a fiduciary relationship, the duties of a trustee to his cestui que trust, and the requirements of loyalty to a co-adventurer. Those principles apply here, but only as applied to the property involved and the existing property rights. Here each party owed a high degree of loyalty to the other, as applied, however, to the assembling of leases and the drilling and developing of the specified area involved, and the further duty of faithfully accounting for the income. As to those matters, the parties did not deal at arm's length, but trusted and relied upon each other. Brit-

ish American owed to Midway a high degree of loyalty, diligence, and fidelity, and that will not consciously be lowered by any judgment of this court. But when every such duty has been discharged in full, no court has the right to enlarge the duty of British American and create new rights in Midway by decreeing to Midway a share of profits made by British American from a private risk in a separate enterprise. This cannot be fairly done even in the name of a fiduciary relationship, or a trust relationship, however sacred in the law are those relationships, and the duties and rights arising therefrom when properly analyzed, applied, and enforced.

Upon this point the plaintiff cites Trice v. Comstock (C. C. A. 8 Cir.) 121 Fed. 620, but there the violation of duty related directly to the property involved in the relationship.

Plaintiff also cites Meinhard v. Solmon (N. Y. Court of Appeals) 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, where the opinion from the outstanding pen of Justice Cardozo upholds the principle that as between persons situated as those were, "the punctilio of an honor the most sensitive" is "the standard of behavior." We are not unmindful of the soundness of the doctrine of that opinion, and others cited therein, as applied to the property which was the subject-matter of the relationship. The Meinhard Case has some similarity of fact to the case at bar. There, too, was a leasehold estate, held and operated by a trustee for joint or mutual benefit. But the breach of duty was different from the asserted breach here. There, some time before the lease expired, the trustee in possession secretly took a new lease to himself alone covering the **identical property**, together with some adjoining space, whether much or little of other adjoining property is not shown. The opinion points out that thus the trustee cut off or undertook to cut off the right of the cestui que trust to share in the profit of a renewal of the lease, and that, too, while the lease had yet some time to run. It is well pointed out there that the act did constitute a violation of the duty of the trustee as to the specific property which was the subject of the relationship. It was there said, "Here the subject-matter of the new lease was an extension and enlargement of the subject-matter of the old one."

Plaintiff cites other cases wherein the breach of trust related directly to the property or right which was the subject of the relationship, viz.: Selwyn & Co. v. Waller, 212 N. Y. 507, L. R. A. 1915B, 160; Case v. Carroll, 35 N. Y. 385; Wendt v. Fisher, 154 N. E. 303; Miller v. O'Boyle, 89 Fed. 140; Waller v. Henderson, 135 Okla. 231, 275 P. 323; Anderson v. Whitener, 127 Okla. 284, 261 P. 156; Shaffer v. Letcher, 99 Okla. 188, 226 P. 384, and Hivick v. Urshel, 171 Okla. 17, 40 P 2d 1077, and Henry v. Raiman, 25 Pa. 354. This last case involved a purchase by an attorney of an interest in the property right, the subject matter of the relationship. Along that same general line, and in reference to the high duty of an attorney to his client, reference might have been made to Gragg v. Pruitt, 179 Okla. 369, 65 P.2d 994. But neither that case nor any of the others cited go to the extent of supporting plaintiff's contentions as applied to the facts in the case at bar.

In Meinhard v. Solmon, above noticed at length, the court had in mind that in cases involving these questions as to duties of fiduciaries, or trustees, precedents are of scant value because of differences in the various fact situations. It was there said: "Little profit will come from a dissection of the precedents. None precisely similar is cited in the briefs of counsel." That expression is quite appropriate here. The plaintiff refers to many other decisions and text statements which we deem not to require separate discussion.

Plaintiff refers to the law of partnership and quotes two paragraphs from 47 C. J. Title "Partnership," sec. 248 (pp. 800, 801) as follows:

"A partner may not purchase, for his own benefit, property of any kind in which the partnership is interested, nor lease property when the firm is entitled to the benefit of such lease, nor secure a valuable contract for himself which it was his duty to secure for the firm If he does, he holds in trust for the benefit of the partnership the property so purchased or leased, or the contract he has obtained, and must account to the firm for the profits of the transaction, unless it appears that the copartner consented to the transaction.

"Interests adverse to a copartner may, however, be lawfully acquired by a partner, when these are outside of the partnership affairs, for in such transactions they are in no sense confidential agents or trustees for each other."

Treating British American and Midway as partners for the purpose of discussing this citation, we think it must be apparent that British American did not obtain a lease "when the firm is entitled to the

benefit of such lease, nor secure a valuable contract for himself which it was his duty to secure for the firm." This is true because the Piersol and Russell Place leases were both outside of the specified area in which British American was to secure leases for the mutual benefit. That being true, the last paragraph above quoted states the rule supporting the contention and theory of British American that those leases were properly acquired as separate property for a separate enterprise.

Plaintiff discusses the relationship between the parties as if it were upon a far larger basis than the area contracted upon. The thought is suggested that the parties had in mind, not only the area contracted upon, but also the general geological structure that might be discovered or encountered. This would treat the contract and relationship as applying more to an arrangement for the general acquisition of leases and prospecting for oil. In our view the parties here did not in any sense intend an arrangement of partnership for the general acquisition of leases, or a general prospecting for oil and development of general oil properties. We think it perfectly clear that the arrangement was desired to be made, and was made, with reference to definite area and acreage.

Plaintiff lays stress upon the fact that other leases were to be acquired, but the fact is that those other leases were to be acquired for the expressed purpose of aggregating more than the required 51 percentage in each block. It was also desired to raise the percentage to as nearly 100 per cent. in each block as possible, as that would be for the best interest of each of the parties. But the fact that other leases in these blocks were to be obtained furnishes no ground for the further contention that it was contemplated that other leases would be jointly acquired within whatever might be determined to be the general geological structure. It was not known, of course, how restricted or how largely extended such geological structure might be. As to this part of the argument, we think plaintiff enlarged on the relationship out of all proper and reasonable proportion to the true status and relationship. The relationship of the parties here was much more nearly analogous to a drilling contract on a single tract or lease than it is analogous to an arrangement as general partners for the general acquisition and development of oil leases for mutual benefit.

It is asserted by the plaintiff that, aside from the provisions of the contract, there is other evidence in the record justifying the trial court's conclusion.

Our attention is directed to conversations and statements by individuals associated with one company or the other after the execution of the original contract, and there is testimony as to the understanding or intention of such individuals as to the relationship created and existing between the parties. At one point in the record, when evidence was introduced tending to show that after British American had purchased the Piersol lease, one of the principal owners of Midway acquiesced in the thought that the Piersol lease was properly the private and personal venture of the British American. In objecting to that testimony it was pointed out in the record that such statement, if it was made, would not be binding on the Midway corporation, and would not change the contract rights of Midway. There is also testimony tending to show that certain men in British American had been advised before the execution of the contract that certain efforts had been made by Victor or by individuals to obtain the Piersol lease, and that geological reports indicated the Piersol lease should promise production. Most, if not all, of the evidence referred to in this paragraph was contradicted. We do not purport to here refer to all items of such other evidence. Most, if not all of it, was objected to, and some of it was not admissible. At any rate, there is no evidence that any one with authority to bind Midway specifically agreed that the Piersol and Russell Place leases were not within the contract or relationship of the parties; nor is there any evidence that any one with authority to bind the British American agreed that these leases were within the contract, or the relationship, or the contemplation of the parties in making the original British American-Victor contract. Isolated bits of evidence, if considered alone, would tend to support plaintiff's theory. But a comprehensive consideration of all of this character of evidence, together with the contract itself, and the relationship expressly created by the contract, convinces us that in this case there is no proper yardstick or guiding chart, except the contract itself; that by it we must measure the relationship of these parties, and it must serve as a guide to the proper conclusion as to the nature and extent of the relationship, and as to what was included in the relationship and what was outside of the relationship. The Midway corporation purchased

this contract from Victor, and while Midway thereby succeeded to all of the rights of Victor, it is difficult to see how Midway could successfully contend for anything above and beyond the contract. The contract was undoubtedly the foundation of every right which Midway has as against British American. Of course, if there had been any modification of the contract after Midway bought it, or any change in the relationship of the parties from the contract relationship, then, of course, Midway could profit thereby. but no such modification or change was pleaded or proven. Several months' time elapsed between the time Midway purchased the Victor contract interest and the time when British American procured the Piersol and Russell Place leases, yet at no time was it expressly pointed out to British American, or any one associated with British American that Midway expected the Piersol lease to be procured for mutual benefit, or that Midway contended that other lands outside the specified development area were included in the contract or in the relationship of the parties. It is a significant fact that these leases could not at any time have been procured within the limit or upon the basis specifically contemplated and provided in the contract as the basis upon which other leases in the specified area were to be obtained. In purchasing these leases it was necessary for the British American to make larger concessions than would have been permissible as to leases acquired under the terms of the contract. The lease obtained by British American in the specified area and within the limit of concession with lessor could not be refused by Midway. But as to the Piersol and Russell Place leases, British American had no authority to purchase them and bind Midway for the costs. Evidently some time elapsed between the time Midway knew of the purchase of these leases by British American and the time their high value was established by development. Midway seems not to have immediately put forward a claim that it should pay for these leases and have them held for mutual benefit as in the case of other leases obtained by British American in the specified development area. After the Piersol and Russell Place leases had been developed to a great value, it was easy to see that. although a large price had been paid for those leases. a great profit would certainly be realized above that large price consideration. Then it was not difficult for Midway to desire a portion of that great profit and to prosecute with much vigor its effort to obtain a share in

that profit. As pointed out, a large price was paid by British American for the Piersol and Russell Place leases; it could not have been contemplated by Victor at the time of making the original contract that it would pay any such price for these leases. The owners of those lands, of course, took advantage of such information as they could obtain as to development in the British American-Midway development area, and made their price demands accordingly. At any rate we can reach no other conclusion than that the rights of Midway are limited by the original contract, and that under the contract Midway has no right to compel a sharing of the profits on these leases. Of course, in the first instance, Victor might have contracted for such a right. Perhaps Midway after purchasing the Victor contract could have protested or provided for such a right in advance of the purchase of these leases, and in advance of their acquiring great value. At least, Midway could have endeavored to do so. But no such effort was made.

The record in this case is quite extensive. The briefs are voluminous. There are many details of the evidence which we have not here recited and there are many points of argument which we have not separately discussed. To recite and discuss all such items would require an opinion of interminable length, as the case is vigorously contested in minute detail. Nor have we found it necessary to discuss each of the many cases cited. We are convinced, however, from the entire record that the relationship of these parties and its foundation base cannot reasonably be enlarged to the point necessary to sustain plaintiff's right to recover one-half of the Piersol and Russell Place leases. To do so, as we view it, would be to make an extension of the contract rights and liabilities, wholly unwarranted by the record, and would amount to the creation of a relationship not in any sense created by the parties. All this the trial court deemed it proper to do, under the facts. We conclude that the judgment for plaintiff on this branch of the case is contrary to law, and the findings of fact for plaintiff are against the clear weight of the evidence. The trial court should have denied the plaintiff any recovery. The judgment for plaintiff must, therefore, be reversed.

As another branch of the case we now consider the cross-petition of defendant British American. By this pleading the defendant sought to recover damages for the

alleged breach of another provision of the British American-Victor contract; that is, the provision that:

"Neither party shall sell all or any part of its interest in the leases described in exhibit A or in leases subsequently acquired and covered by this contract without first notifying the other party in writing of the interest to be sold, and the highest bona fide offer made for the same. The party receiving such notice shall have ten days' time within which to elect to purchase such interest at the price designated in such notice. * * *"

The essential facts are that all, or practically all, of the stockholders of Midway exchanged such stock for stock, in satisfactory amount, in the Barnsdall Oil Company, a corporation. There was no specific sale by Midway of the oil and gas leases referred to in the British American contract. There was no liquidation or dissolution of the Midway Oil Company. That corporation still exists. That corporation, since purchasing from Victor, has owned and now owns the leases and rights provided for in the Victor-British American contract.

Strictly speaking, that contract does not attempt to prevent any stockholder of Victor or Midway from selling his stock or exchanging the same.

It is true that the chief ownership and management of Victor and Midway were originally the same, or nearly so. It is contended by Midway that this stock exchange was not any subterfuge for the conveyance of these assets to Barnsdall. If the Midway and its official family, on one hand, and the British American and its official family, on the other hand, were such partners, or such trustee one to the other, or such fiduciaries in general one with the other, by reason of the relationship created by the British American-Victor contract, as to sustain plaintiff's contentions for half of the Piersol and Russell Place leases, then that relationship might be such as to require that plaintiff deal differently with the British American people before this stock exchange was made.

However, we think the rights of all parties must be governed by the contract. Under that contract British American is not entitled to any recovery by reason of this exchange of corporate stock, because it does not violate the contract. Thus we use the contract and the relationship created by it to test and limit the rights of British American, as we use the same contract to test and limit the liability of British American in reference to the Piersol and Russell Place leases.

There is no more justification for enlarging the contract right in favor of British American as to this matter than there is for enlarging the contract right in favor of Midway as to the outside leases.

We deem it unnecessary to cite authorities supporting our conclusion that the trial court correctly denied British American any recovery on this cross-petition.

When we deny plaintiff any recovery on its petition, and deny defendant any recovery on its cross-petition, under the facts in this case, we have enforced their contract equally for and against each party. We have not enlarged the contract nor decreased or lessened its scope. We have not enlarged the relationship created by the contract in behalf of either party. We have declined to contract for the parties or alter the contract which was fairly entered into by them, and which has and will richly reward them both. We have followed the rule that equity follows the law, and we have accorded each party his full rights and no more.

The judgment of the trial court against the cross-petition is affirmed. The judgment in favor of plaintiff as to the Piersol and Russell Place leases is reversed, and the cause remanded, with directions to render judgment on that point for the defendant, British American.

OSBORN, C. J., BAYLESS, V. C. J., and RILEY, PHELPS, CORN, GIBSON, HURST, and DAVISON, JJ., concur.