**CIMARRON OIL & GAS, INC., an Oklahoma corporation, Appellant,**

v.

**BENSON–McCOWN & COMPANY, a Texas corporation, Appellee.**

**No. 70,918.**

Court of Appeals of Oklahoma, Division No. 3.

July 18, 1989.

Rehearing Denied Sept. 12, 1989.

Allan DeVore, Oklahoma City, for appellant.

Michael G. Harris, Oklahoma City, for appellee.

## MEMORANDUM OPINION

HANSEN, Presiding Judge:

Plaintiff Cimarron Oil and Gas, Inc. (Cimarron) filed this action in 1983. In its original petition Cimarron alleged six causes of action, five of which were dismissed. In the only remaining cause of action, the fifth cause of action, Cimarron sought damages from Benson–McCown (BMC) for breach of a fiduciary duty. BMC filed a motion for summary judgment in this cause of action attaching affidavits and deposition testimony. Cimarron appeals the trial court's order sustaining BMC's motion. We affirm.

The relationship between the Cimarron and BMC arose from a consulting agreement executed in January of 1981 wherein BMC agreed to sell oil and gas limited partnership interests in Drilling Program 1980–2 offered by Cimarron. Drilling Program 1980–2 involved an oil and gas prospect, the Wilde Prospect, consisting of a single oil and gas lease. BMC served as broker for sale of interests in the Drilling Program and received as compensation a carried interest in the program. Drilling on the Wilde Lease commenced in December of 1980 and was completed as a producing well in February of 1981.

In its petition, Cimarron alleged BMC was a joint venturer with Cimarron, and as such owed a fiduciary duty to Cimarron. It further alleged that through insider information provided by the president of Cimarron, BMC purchased an offset lease, the Cawood lease, for its own benefit. The Cawood lease was adjacent to and part of the same formation as the Wilde lease. Cimarron claims the purchase was without the knowledge of Cimarron and to its detriment.

The trial court specifically found the relationship between Cimarron and BMC was based entirely on the consulting agreement which did not apply to leases outside the Wilde lease. It also found there was no agreement between the parties pertaining to the Cawood lease. Thus, any fiduciary duty owed Cimarron by BMC was limited to the area covered by the consulting agreement.

On appeal Cimarron contends the trial court erred as a matter of law in finding no fiduciary duty arose out of the relationship of the parties that would prohibit BMC from profiting from its use of the confidential information contained in the Drilling Program. Cimarron claims as a broker for the Drilling Program, BMC owned an interest in the program.

The consulting agreement provided Cimarron would compensate BMC with a participatory share of the profits from the Drilling Program as well as a share of the management fee for the Program. This is sufficient, says Cimarron, to create a joint venture and the corresponding fiduciary duty.

We agree with Cimarron that if the agreement was in the nature of a joint venture, then BMC would indeed owe a fiduciary duty to Cimarron. The relationship between parties to a joint venture is fiduciary in its character and requires the utmost good faith in all the dealings of the parties with each other. *Rockett v. Ford,* 326 P.2d 787 (Okla.1958).

What constitutes a joint venture? The well-recognized requirements for determining whether a business relationship between two or more persons constitutes a joint venture are set out in *Oklahoma Company v. O'Neil,* 440 P.2d 978 (Okla. 1968). They are (1) there must be a joint interest in the particular property or project involved, (2) an agreement, either expressed or implied, to share in the profits and losses, and (3) acts or conduct reflecting cooperation in the project.

In this case Cimarron contracted with BMC to sell the 1980–2 Drilling Pro-

gram to investors, to provide consulting services to the investors, to maintain communications between Cimarron and the investors, to transmit information concerning the business, and to review and comment on matters proposed by Cimarron. The compensation to be paid to BMC was "one-half of the management fee provided for Cimarron in such Program Agreement." In addition BMC was to receive "an amount equal to 31.25% of Cimarron's net revenue interest in such Program Agreement prior to payout and 25% of Cimarron's net revenue interest in such Program Agreement after payout." BMC was not to receive an interest in the lease. There was no provision that BMC would share in the profits and losses of the program. The absence of these factors alone negates the existence of a joint venture under *Oklahoma Company v. O'Neil, supra.* The materials submitted by the parties for consideration by the trial court on BMC's motion for summary judgment do not evidence an agreement between the parties to develop the Wilde lease as a single enterprise for jointly sought profit. *See, Martin v. Chapel, Wilkinson, Riggs, and Abney,* 637 P.2d 81 (Okla.1981). The trial court was clearly correct in finding Cimarron and BMC were not engaged in a joint venture.

The consulting agreement provided the sole benefit and remuneration to BMC. Thus, any fiduciary duty that might exist between Cimarron and BMC must arise from that agreement. The consulting agreement itself did not apply to land outside the Wilde lease and did not specifically preclude BMC from acquiring oil and gas leases outside the boundaries of the Wilde lease.

The issue of the scope of a fiduciary duty arising from a written contract was addressed by the Oklahoma Supreme Court in *British American Oil Producing Co. v. Midway Oil Co.,* 183 Okla. 475, 82 P.2d 1049 (1938). In that case the parties had entered into a contract for the joint development of oil and gas leases covering a specific geographical area. British American subsequently purchased other leases adjacent to those specified in the contract. Midway brought suit against British American for damages for breach of a fiduciary duty. The Supreme Court stated:

"... we find nothing in the contract that would prevent either party from acting outside of the area for his own benefit, even though influenced in such action by information obtained within the specified area.

. . . . .

It is clearly apparent that the contract does not bind either party in any way as to any territory or transaction outside of the specified development area, and that the contract cannot be so construed as to hold and bind British American in the manner which Midway here seeks to hold British American."

. . . . .

Neither (British American or Midway) owed any further duty to the other. And each, after discharging such contractual duty to the other was free to carry on in any other or similar enterprise elsewhere."

Accordingly, if the consulting agreement did not prohibit BMC from acquiring leases outside the area, then it was free to do so. Cimarron, however, submits the consulting agreement incorporated the provisions of the Drilling Program 1980–2 by reference. The offering circular to Drilling Program 1980–2 did include conflict of interest provisions. It provided in part:

"... Cimarron does not intend to acquire undeveloped acreage for the purpose of developing it for its own account in competition with programs it sponsors, nor will it or any affiliate retain undeveloped acreage adjoining the program's prospects in order to use program funds to 'prove up' the acreage for its own account."

Cimarron argues this provision applies to BMC. Apparently Cimarron views BMC as an "affiliate" of Cimarron. However, this provision is simply a reassurance that investors' funds would not be used to "prove up" adjoining acreages through drilling on the Wilde lease. In this case BMC had no control over investors' funds. The original contract did not embrace the general business of acquiring mineral leases. Cimar-

ron and BMC had a written contract which was limited to the Wilde lease. Cimarron did not resist the motion for summary judgment by offering any evidence that the agreement extended to and reached properties outside the agreement. *See Rankin v. J.M. Naftalis,* 557 S.W.2d 940 (Tex.1977). Although BMC may have decided to purchase the Cawood lease based on the success of the Wilde lease, there is nothing in the consulting agreement to prohibit such an acquisition.

In its final proposition of error, Cimarron submits BMC interfered with its business relations. It argues BMC conspired with the president of Cimarron to deny Cimarron a business opportunity. This issue is not before us today. Cimarron's fifth cause of action did not plead conspiracy or interference with business relations. Issues not properly presented to the trial court cannot be considered by this Court on appeal. *Steiger v. City National Bank of Tulsa,* 424 P.2d 69 (Okla.1967).

JUDGMENT AFFIRMED.

BAILEY, C.J., and REYNOLDS, J., concur.