REX OIL REFINING, INC., a Corporation,
Plaintiff in Error,

v.

Howard SHIRVAN et al., Defendants in Error.

REX OIL REFINING, INC., a Corporation,
Plaintiff in Error,

v.

Sidney KULICK et al., Defendants in Error.

REX OIL REFINING, INC., a Corporation,
Plaintiff in Error,

v.

Stanley SHIRVAN et al., Defendants in Error.

REX OIL REFINING, INC., a Corporation,
Plaintiff in Error,

v.

Leonard KULICK et al., Defendants in Error.

REX OIL REFINING, INC., a Corporation,
Plaintiff in Error,

v.

Jennie KULICK et al., Defendants in Error.

Nos. 41026–41030.

Supreme Court of Oklahoma.

May 23, 1967.

As Corrected May 31, 1967.

Rehearing Denied July 11, 1967.

As Amended July 8, 1968.

Dissenting Opinion July 9, 1968.

Second Rehearing Denied July 9, 1968.

Erwin & Erwin, Chandler, for plaintiff in error.

Barefoot & Moler, Oklahoma City, Richard James, Stroud, for defendants in error Howard Shirvan, Sidney Kulick, Stanley Shirvan, Leonard Kulick and Jennie Kulick.

John S. Miller, H. D. Bushnell, Tulsa, for defendant in error Amerada Petroleum Corp.

DAVISON, Justice.

The above styled and numbered appeals upon stipulation and application of the parties were by order of this court consolidated and will be disposed of by this decision.

Rex Oil Refining, Inc., (plaintiff) filed separate actions in the lower court against Howard Shirvan, Sidney Kulick, Stanley Shirvan, Leonard Kulick and Jennie Kulick (herein referred to as "individual defendants"), and Moran Gasoline Corporation, alleging plaintiff was the owner of certain undivided interests in an oil and gas lease and was the operator of the allowed gas well thereon, and that the individual defendants each owned a described undivided interest in a part of said lease and were indebted to plaintiff for their proportionate part of plaintiff's expense in the development and operation of such well. Plaintiff asked for judgment against the individual defendants, and for a lien upon their interests and the funds held by Moran for them that had accrued from sale of the gas, and for an attorney's fee.

Warren Petroleum Corporation later became a defendant as successor to Moran Gasoline Corporation and Apache Gas Products Corporation became a defendant as purchaser of gas from the well. Amerada Petroleum Corporation was later made a defendant because, under the circumstances hereinafter stated, it held an overriding royalty interest in the formation from which the gas was being produced.

The individual defendants each filed identical answers and cross-petitions, except as to the respective interests each claimed to own, in which they alleged a relationship of joint venturer or mining partner with plaintiff, and claiming each owned a larger interest in the lease and gas production than plaintiff attributed to them, and taking issue with the amount charged to them for development and operation expense.

The trial court rendered a judgment adverse to plaintiff and in favor of the individual defendants and plaintiff has perfected these several appeals.

The controversy grew out of the following circumstances. In 1951 Amerada acquired an oil and gas lease on the Southwest Quarter of Section 29, Township 15 North, Range 4 East of I. M. in Lincoln County, Oklahoma. In August, 1954, Amerada and Lee Evans Drilling Company (Evans) entered into a farmout agreement by which Evans was to drill a well in the SW SW SW of said Section to test the Red Fork Sand for an assignment of the lease insofar as it covered the NE SW and SW SW of said Section. Evans drilled the well. The Red Fork Sand was not productive of oil or gas and the well was plugged back to the Skinner Sand and completed as a gas well, but was shut in for lack of a gas market. In September, 1954, Amerada gave Evans an assignment of the lease, without reservation, insofar as it covered the NE SW and SW SW of said Section. By assignment dated February 28, 1955, Evans, while charged with the care and operation of the lease, assigned to the individual defendants various interests (totaling 1/8) in the leasehold estate on the NE SW and SW SW of said Section.

On December 22, 1955, the Oklahoma Corporation Commission entered an order fixing 160 acre drilling and spacing units, covering the area herein involved, for production of gas from the Skinner Sand, designating the said Southwest Quarter as a unit, and making the above gas well the permitted well for the unit. This spacing order was made upon an application filed by a party having mineral interests in the

designated area other than the Southwest Quarter.

Apparently Evans also assigned additional interests in the lease. On July 15, 1958, Evans assigned all its remaining interest in the lease (undivided ⅜) to Claybrook Drilling Company and on December 8, 1959, Claybrook assigned this interest to V. J. Devine. On January 8, 1960, Devine assigned the interest to the plaintiff.

In the interim period the well remained shut in for lack of a market for the gas.

In the summer of 1959 plaintiff had started investigating the possibilities of acquiring all or a part of the lease on said Southwest Quarter and adjacent leases on which wells had been drilled, and providing gathering lines and finding a profitable market for the gas. Plaintiff did acquire a majority of such interests in said Southwest Quarter and finally arranged for Moran to buy the gas and furnish some financing, whereby the subject well and some five other wells (operated by plaintiff) on adjacent or nearby leases were joined in a gathering system. Plaintiff approached Amerada in January, 1960, relative to acquiring the lease Amerada held on the NW SW and SE SW within the spaced unit. Plaintiff informed Amerada of the action taken to acquire other interests in leases in the area and the arrangements made to sell the gas, and also that $40,000 would be the cost of drilling and equipping a similar well. Upon consideration of all aspects of the situation, including cost of the well (estimated by Amerada to be $38,000) and the gas reserve, Amerada decided that it did not wish to pay its share of the cost of the well, and offered an assignment with a reserved overriding royalty. As a result of their negotiations Amerada, on February 26, 1960, assigned the lease to plaintiff insofar only as it covered the oil, gas and minerals in the Skinner formation, but reserving to Amerada an overriding royalty interest of ⅛ of ⅞ in all production from that formation, free and clear of all costs, charges and claims except taxes, and subject to the communiti-

zation of royalty provision in the Corporation Commission spacing order of December 22, 1955.

Beginning in January, 1960, the plaintiff negotiated with the individual defendants for purchase of their interests. In these negotiations the plaintiff would not admit nor recognize that the individual defendants had any interest in the leasehold interest the plaintiff had acquired from Amerada. It was and is the contention of the individual defendants that they own the same proportionate interest in such leasehold interest as they have in the divided portion covering the NE SW and SW SW of said Section.

Beginning May 1, 1960, the plaintiff began producing gas and sold the gas to Moran and later to Apache. The purchasers have withheld 1/16 of the proceeds because of the dispute between plaintiff and the individual defendants as to the interest of the individual defendants and the amounts chargeable to them for development and operating expenses.

The trial court made extensive findings of all matters above narrated and of all circumstances and charges made by plaintiff for its expenses and its method of accounting. The lower court found and concluded that plaintiff was the operator of the leasehold estate, that the legal relationship between plaintiff and the individual defendants in the 80 acre portion of the lease originally secured by the individual defendants from Evans (hereinafter referred to as "original 80 acre lease") was that of cotenants; that under the circumstances and law the limited assignment by Amerada to plaintiff of the lease on the remaining 80 acres, supra (hereinafter referred to as "Amerada 80 acres"), was for the benefit of the cotenants; that it would be unfair and inequitable to permit plaintiff under the 160 acre spacing order to reduce the interest of the individual defendants by one-half, by taking an assignment from Amerada of the lease on the Amerada 80 acres in lieu of Amerada's proportionate part of the drilling cost of the well; and

that plaintiff held the interest acquired from Amerada in trust, for the benefit of the cotenant individual defendants. The court concluded that the individual defendants' (collective) interest in the original 80 acre lease was $\frac{1}{8}$ of $\frac{1}{2}$ of $\frac{7}{8}$ minus their proportionate part of an override that was outstanding at the time they acquired their interest from Evans, and their interest in the Amerada 80 acre lease was $\frac{1}{8}$ of $\frac{1}{2}$ of $\frac{7}{8}$ minus their proportionate part of the override reserved by Amerada, supra.

The lower court further found and concluded that the charges made by plaintiff to the individual defendants for their proportionate part of the costs of operating the lease were exorbitant and unreasonable and an attempt by plaintiff to charge its entire corporate expenditures against the lease and adjacent leases and fixed what it considered, under the evidence, to be a reasonable amount for overhead expense plus direct operating expense as disclosed by the evidence. This phase of the appeal will be treated more fully in a subsequent part of this opinion.

The court further adjudged Amerada was not obligated to plaintiff or the defendants for any part of the costs of drilling or operating the well (because of the in lieu settlement), gave appropriate money judgments for the amounts due the individual defendants, denied attorneys' fees to any of the parties, and taxed the costs equally to plaintiff and the individual defendants.

Both plaintiff and the individual defendants devote argument to the proposition of whether or not the narrated evidence and other evidence established a mining partnership between them. Our disposition of these appeals does not require determination of this question.

Plaintiff agrees with the conclusion of the trial court that it was a tenant in common with the individual defendants, but contends that it was privileged to acquire the leasehold interest from Amerada free and clear of any right in the individual defendants to participate therein. The individual defendants contend that, conceding they were tenants in common and not mining partners in the Evans original 80 acre lease, still, under the particular circumstances the acquisition of the leasehold interest in the Amerada 80 acres inured to the benefit of the individual defendants in the proportion that they owned interests in the original 80 acre lease.

As stated, the well was completed as a gas well in the fall of 1954. The well was complete with casing and tubing and ready to produce gas but there was no market and the well was shut in to wait until there was a market. The record reflects that it was accepted and recognized at all times that the well was a gas well and the reason it was not produced was because of lack of a market. When the individual defendants bought in February, 1955, they collectively acquired an undivided one-eighth interest in the Evans original 80 acre lease and in the well, complete with casing and tubing, and ready to produce gas. The situation at that time was that the individual defendants had no interest in the leasehold on the Amerada 80 acres, and Amerada had no interest in the Evans original 80 acre lease nor in the gas well located thereon. When the Corporation Commission entered its order in December, 1955, designating the entire 160 acres as a spacing unit, the well was still shut in for lack of a market, and there was no need or occasion to determine the rights of leaseholders in the spaced unit to future production or the prerequisites to Amerada sharing in the production. However, the spacing order set the stage and established that production from the permitted well would accrue to all mineral owners within the spaced unit, and thereby diminish the returns the individual defendants would otherwise have received. 52 O.S.1961, § 87.1(d).

The plaintiff sought and did acquire a majority of the working interest in the Evans original 80 acre lease and undertook and did assume the position of operator of the lease. In fact, Amerada required a showing from plaintiff that it and its predecessors in interest were the operators of the lease. In the negotiations of plain-

tiff and Amerada concerning Amerada's lease on the Amerada 80 acres and the status thereof in the spaced unit the cost of drilling and completing the well was estimated at about $40,000.00. From our examination of the record there is no doubt but that the assignment of February 26, 1960, from Amerada to plaintiff was given in lieu of Amerada paying one-half of the cost of drilling and completing the well as a prerequisite to Amerada participating in the production. No money was paid to Amerada for the assignment.

■ Under the provisions of 52 O.S. 1961, § 87.1(d) plaintiff and Amerada, and owners of working interests, may agree to pool their interests, or if they had not agreed then upon application to the Corporation Commission an order thereof would have made definite provision for proportionate payment of the cost of development and operation as a condition for Amerada receiving its share of the gas produced from the permitted well. In the present situation the well was drilled and completed prior to the spacing order. Amerada was obligated to pay a proportionate part of this cost before sharing in the gas production. Wood Oil Co. v. Corporation Commission, 205 Okl. 537, 239 P.2d 1023, and Wilcox Oil Company v. Corporation Commission, Okl., 393 P.2d 242.

■ No application was filed with the Corporation Commission. As stated, the spacing order added an additional 80 acres to the acreage entitled to share in the production and the net result was to reduce the individual defendants' participation in the gas production by one-half. However, this did not reduce the interest of the individual defendants in the completed well itself. Plaintiff, a cotenant of the individual defendants, acquired from Amerada the mineral leasehold interest that caused (by force of the spacing order) the reduction in the individual defendants' participation in the gas production, and seeks to retain it wholly for itself without regard to the effect thereof on the individual defendants, and in spite of their collective ⅛ interest in

the completed well itself. It is our opinion that under the present particular circumstances the lease on the Amerada 80 acres was an outstanding mineral interest and that the acquisition by plaintiff inured to the benefit of the individual defendants to the extent of their undivided interests in the original 80 acre lease and the well thereon.

We are cited to no case presenting the instant factual situation.

In Ellis v. Williams, Okl., 297 P.2d 916, we held that cotenant owners of an estate in lands stand in a relation to each other of mutual trust and confidence, and neither will be permitted to act in hostility to the other in reference to the joint estate.

■ In the early case of Arthur v. Coyne, 32 Okl. 527, 122 P. .688, the rule is stated as follows:

"Cotenant owners of an estate in lands stand in a relation to each other of mutual trust and confidence, and neither will be permitted to act in hostility to the other in reference to the joint estate; and a distinct title acquired by one will ordinarily inure to the benefit of all."

See Wallace v. Brooks, 194 Okl. 137, 147 P.2d 784, 790, in which we announced that this is the general rule.

■ In 20 Am.Jur.2d, Cotenancy and Joint Ownership, Sec. 70, pp. 167, 168, it is stated, relative to the rule that an outstanding adversary title acquired by a cotenant inures to the benefit of his fellow cotenants, as follows:

"Moreover, the doctrine is one of equitable cognizance and is not applied by hard-and-fast rules, but in such manner as to do justice in accordance with the facts of the particular case. * * *"

This court, in Burt v. Steigleder, 132 Okl. 217, 270 P. 54, recognized that the rule, supra, was one of equitable cognizance. The decision states:

"However, where the facts warrant and justify, there are numerous and ample authorities holding that a purchase of an outstanding adverse title by a cotenant

will be held in *equity* to have been made for and on behalf of the other cotenants as well as himself. See cases collected 6 A.L.R. *297*; *7* R.C.L. § 51, p. 857; Arthur v. Coyne, supra. In the instant case were there no seeming *equity or facts* upon which the judgment might be sustained or upon which the trial court might have based its decision on behalf of plaintiff, other than upon the fact that the parties were cotenants in the oil and gas rights in the land involved, we would not be inclined to sustain the judgment of the trial court upon that ground alone. * * *" (emphasis ours)

And, in Ammann v. Foster, 179 Okl. 44, 64 P.2d 653, 656, we find the following statements:

"As heretofore stated by this court, the rule that an outstanding title acquired by a tenant in common is presumed to be for the common benefit is not an absolute rule, and may be qualified by circumstances surrounding the particular case.

* * * * * *

"We find in this case no *equities* arising in favor of plaintiffs which would justify the application of the general rule." (emphasis ours)

It is our opinion that the circumstances and equities in the instant case sustain the conclusion of the lower court that it would be unfair and inequitable to permit the plaintiff to retain all interest in the lease covered by the assignment from Amerada to plaintiff and its further holding that plaintiff holds the same in trust for the individual defendants to the extent of their respective undivided interests in the Evans original 80 acre lease and the well thereon.

In connection with the proposition under discussion, the plaintiff presents some argument that under the judgment of the trial court the individual defendants would acquire their interest in the lease on the Amerada 80 acres as "an outright gift to the defendants without any consideration."

This matter of contribution by cotenants has been before this court in a case where one cotenant had acquired an outstanding mortgage on the jointly owned property, and we held the other cotenants were obligated to pay their proportionate part of the amount paid for the mortgage in order to retain their share of the property. Knesek v. Muzny, 191 Okl. 332, 129 P.2d 853. Assuming the same principle would apply to the instant matter, still the argument of plaintiff must fail. Plaintiff paid no money for the lease on the Amerada 80 acres. The assignment was given by Amerada in lieu of Amerada paying one-half the cost of the well and thereby participating to that extent in the production from the well. The individual defendants ratified this and asked only that they have the same interest in said lease as they have in the well. Furthermore, the individual defendants have been willing, and the lower court's judgments provided, supra, that their interests in the Amerada 80 acre lease bear a proportionate share of Amerada's reserved overriding royalty. We fail to see wherein this is a gift.

In Burt v. Steigleder, supra, we stated:

"In an action of purely equitable cognizance, this court will not disturb the decree of the trial court unless, from an examination of all the evidence in the case, it appears that such decree is clearly against the weight thereof."

The judgments of the lower court granting to the individual defendants an interest in the Amerada 80 acre lease is affirmed.

Plaintiff further contends the lower court improperly adjusted the accounts between it and the individual defendants relative to the costs and expenses expended by plaintiff in the completion, operation and production of the well. The individual defendants admitted a pro rata liability for these items, but contended at all times that the charges made by plaintiff were exorbitant.

The evidence produced on this was voluminous and covered the expense and cost operations of plaintiff corporation from practically the initial arrangements in early

1960 with Moran to buy the gas and furnish the gathering lines for the subject well and the wells on the adjacent leases. It would serve no useful purpose to attempt to detail the manifold charges plaintiff included in overhead expenses, including, inter alia, the corporate office expense, salaries, travel and entertainment expenses, taxes and corporate license fees, automobile expense, and many others, and constituting an attempt by plaintiff to charge off its entire corporate expenses against the subject lease and adjacent leases. The court found this to be exorbitant and unreasonable and further found from the evidence that the usual and customary manner of accounting between the operator of a lease and the other cotenants in the working interest was to charge each lease with its direct operating expense and a fixed monthly sum for overhead charges.

The lower court determined from the evidence the direct operating expenses on the subject lease and fixed a monthly overhead charge of $50.00 for the gas well. This was charged proportionately to the individual defendants. In fact, the plaintiff's chief officer expressed an opinion that the customary and reasonable charge for administrative overhead on a gas well was $50.00 per month.

From our examination of the record we conclude that this finding and judgment is sustained by the evidence.

Plaintiff further complains of the refusal of the lower court to allow it an attorney fee. Plaintiff bases its right to an attorney fee on its claim that it is entitled to a lien upon the funds owing the individual defendants, but withheld from them pending determination of this controversy.

Plaintiff cites 42 O.S.1961, § 176, which reads as follows:

"In an action brought to enforce any lien the party for whom judgment is rendered shall be entitled to recover a reasonable attorney's fee, to be fixed by the court, which shall be taxed as costs in the action."

The pleadings and evidence show that the plaintiff sought to recover, as operating expenses, a sum greatly in excess of that finally found by the court to be due from the individual defendants. The record reflects that the individual defendants tendered payment of reasonable and necessary operating expenses and the reason for non-payment was the excessive charges made by plaintiff. The amounts due the individual defendants that have accumulated in the hands of the purchasers of the gas and the plaintiff was many times the amounts the court found plaintiff was entitled to charge as expenses. The lower court rendered judgments in favor of the individual defendants and against the plaintiff after allowing these expenses as a deduction from the amounts due them.

In Pierson v. American National Bank of Shawnee, Okl., 325 P.2d 426, 428, we stated:

"The major argument of defendants is directed in support of their claim for an attorney's fee. They contend the statute requires the allowance of a fee to them. 42 O.S.1951, § 176. We do not agree. The statute only authorizes a fee for the party 'for whom judgment is rendered.' This judgment was rendered against these defendants and in favor of the mortgagee. These defendants do not come within the provisions of the statute. * * *"

Under the circumstances the plaintiff was not "the party for whom judgment is rendered" as provided in the cited statute, and it was not entitled to an attorney's fee.

For the reasons stated and upon the authorities herein set out the judgments of the lower court are affirmed.

JACKSON, C. J., and DAVISON, WILLIAMS, BERRY and McINERNEY, JJ., concur.

IRWIN, V. C. J., and BLACKBIRD, HODGES and LAVENDER, JJ., dissent.

HODGES, Justice (dissenting).

I disagree with the majority's adaptation of the facts in the present case to the fol-

lowing principles of law as expounded therein:

"Cotenant owners of an estate in lands stand in a relation to each other of mutual trust and confidence, and neither will be permitted to act in hostility to the other in reference to the joint estate; and a distinct title acquired by one will ordinarily inure to the benefit of all."

In this case we have two distinct properties or oil and gas leases. The ownership of one lease is held by the plaintiff and defendants. The ownership of the other lease was owned by Amerada, then subsequently assigned to the plaintiff. The fact that the Corporation Commission has entered a spacing order joining the two tracts as a unit does not alter the relationship of the owners in the two tracts.

The assignment by Amerada of its 80 acre lease to plaintiff, Rex Oil Co. is *not* adverse or hostile to the other 80 acre lease which is owned by the plaintiff and defendant. The plaintiff did not acquire an adverse title, *but an additional interest in a separate lease*. The interest of Amerada in its lease was not converted into a hostile or adverse title by inclusion of that lease with the original lease in a single spacing unit by the Corporation Commission. The defendants will ultimately recover the same share of production that they would have received had not the spacing unit been created. Instead of being entitled to participate in the production of ⅛th of the working interest in an 80 acre lease, the defendants, by virtue of the spacing order will be entitled to a total participation in production of ⅟₁₆th of the working interest in a 160 acre unit. In fact, with this conservation practice and the sharing of expenses of development and production by the unit owners, it may well be that the defendants' share of production under the unit will be greater. Such lease was therefore not hostile or adverse to the interest of the defendants.

The evidence does not disclose a mining partnership or joint venture between the plaintiff and defendants, and the trial court found that their relationship was one of cotenancy. There is no privity or fiducial relationship between cotenants. Taylor v. Brindley, 10 Cir., 164 F.2d 235. But even assuming a fiduciary relationship between the plaintiff and defendants, the claim of the defendants must fail. If a fiduciary relationship existed, it arose out of the 80 acre lease in which they had a common ownership, and not out of the 80 acres assigned by Amerada to plaintiff. The duties and obligations of a fiduciary necessarily relate to the property or interests common to the parties. British American Oil Producing Co. v. Midway, 183 Okl. 475, 82 P.2d 1049. The spacing order of the Corporation Commission did not create a cotenancy or a fiduciary relationship between the plaintiff and defendants. Wakefield v. State, Okl.Cr., 306 P.2d 305; Amis v. Bryan, 185 Okl. 206, 90 P.2d 936.

The cases cited by the majority which declares that a fiduciary cannot acquire an interest or title which is hostile, adverse or antagonistic are not in point. An examination of those cases show that the adverse, hostile or antagonistic title or interest acquired by the fiduciary *was in or to the same property or property right* held by the one entitled to fidelity from the fiduciary. Such is not the case here.

The majority opinion points out that plaintiff paid no money for Amerada's lease and that the assignment was given by Amerada in lieu of Amerada paying one-half the cost of the well and that it would be unfair and inequitable to allow the plaintiff to retain all of the interest in this lease. The obvious answer to this argument is that the parties were free to bargain and entered into any legal and binding contract they chose. Amerada could have even assigned the lease to the plaintiff as a gift. However, the consideration given for the lease by the plaintiff

was adequate considering the risks involved. At the time of the assignment the potential of the unit was not proven. In fact, the well had been shut down and plugged because of a lack of market. Apparently Amerada was willing to assign this lease to the plaintiff for an override interest because they calculated that the income from the well would not justify the cost of their proportionate share. The plaintiff was willing to assume this risk.

In my opinion this case should be treated the same as if Amerada had not assigned its interest. Before the assignment of the lease to the plaintiff, Amerada was obligated to pay its proportionate cost of drilling the well, together with the production cost, if they were to participate in the income of the well. By acquiring Amerada's lease and its right of participation in the income of the well, plaintiff has also elected to assume its obligations for cost of development and production. Inasmuch as the defendants will benefit by the payment of these costs regardless of whether Amerada or the plaintiff owns the lease, the assignment cannot be considered to be hostile, adverse or antagonistic to the interest of the defendants.

It is grossly unfair to permit these defendants to "lay in wait" and reap the benefits of a risk which only the plaintiff was willing to assume. The defendants had owned their ⅛th interest for over five years without any returns from their investment. The well was shut down and plugged because of a lack of market. In an effort to make a market for this well, the plaintiff also acquired leases in property surrounding the unit. The plaintiff went to considerable expense, effort and risk to develop a field which would create a commercial market. As a result, the interest of the defendants has been enhanced and made productive. The plaintiff took no advantage of the defendants. The same opportunity and information was available to the defendants. The defendants did not assume any risks and expended no effort or money for the development of this market. They should not now be rewarded for their inactivity.

I respectfully dissent.

I am authorized to state that BLACK-BIRD and LAVENDER, JJ., concur in the views herein expressed.