GREAT WESTERN OIL & GAS COMPANY, a corporation, James C. Meade, R. P. Ross and Firth C. Owens, Plaintiffs in Error,

v.

M. J. MITCHELL, Henry Homes, Sr. and Charles Francis McCauley and William C. Wiederhold, co-executors of the Estate of R. G. Piper, Deceased, Defendants in Error.

No. 37299.

Supreme Court of Oklahoma.

March 11, 1958.

Rehearing Denied June 10, 1958.

A. W. Trice, Jim F. Gassaway, Ada, for plaintiffs in error.

McArthur & Orton, by C. L. McArthur, Ada, Willoughby & Cannon, by Calvert L. Cannon, Ada, for defendants in error.

HALLEY, Justice.

M. J. Mitchell, Henry Homes, Sr., and R. G. Piper filed this action in the District Court of Pontotoc County, Oklahoma, against Great Western Oil and Gas Company, Almer Stewart, R. P. Ross, Firth C. Owens, Margaret C. Meade and James C. Meade, alleged to be co-owners in a certain oil and gas lease covering land in that County, and being operated by Great Western Oil and Gas Company, which owned a one-half interest in the lease.

Numerous other defendants were named as parties who had liens against the leasehold estate or who had performed labor or furnished services or materials to Great Western for the operation of the lease, but who had not been paid by the operator, Great Western. Plaintiffs alleged that they had paid their share of the operating expenses to Great Western, except certain sums which were tendered into court. Plaintiffs prayed that all parties having claims against the leasehold be required to present their claims and that plaintiffs be relieved of further liability on such claims.

Appeal from District Court of Pontotoc County; John Boyce McKeel, Judge.

It was alleged that Great Western, as operator of the lease, had made excessive charges for operating expenses and that it

be required to account for and pay any amount found to be due plaintiffs.

Plaintiffs also prayed that the property be partitioned and for appointment of commissioners to make partition.

Plaintiffs alleged that the leasehold estate is not being properly operated by Great Western and that excessive charges are made for operations conducted by it in drilling wells not agreed to by plaintiffs and prayed that a receiver be appointed to take over the operation of the lease. By stipulation K. B. Nowels was appointed to take over the operation of the lease.

Great Western answered by general denial and alleged that it owned a one-half interest in the lease and that R. G. Piper owned a one-sixth interest and M. J. Mitchell a one-sixth interest. It developed that one-half of Mitchell's interest was owned by Henry Homes, Sr., but stood in the name of Mitchell. Ownership of the remaining interests in the lease were set out but we do not deem it necessary to discuss them further here because the issues involved do not cover such interests.

Great Western alleged that on October 30, 1953, it entered into an Operating Agreement in writing with its co-owners in the leasehold estate whereby Great Western was designated operator of the lease and under which agreement it conducted the operations of the lease until May 12, 1954, when such agreement was superseded by a stipulation whereby K. B. Nowels took over the operation of the lease. It was admitted that R. G. Piper did not sign the Operating Agreement, but he was advised of its terms and acquiesced therein and is bound thereby. It is alleged that M. J. Mitchell did not sign the Operating Agreement, having acquired his interest from one who did sign such agreement and is bound thereby.

Great Western alleged that it had fully complied with the terms of the Operating Agreement in every respect and that under its terms, M. J. Mitchell was indebted to Great Western in the sum of $3,876.83, and that R. G. Piper is indebted to it in the sum of $1,791.12. It prayed for judgment against Mitchell and Piper in the sums mentioned.

The record is very voluminous in oral testimony and documentary exhibits. The court entered judgment appointing commissioners to partition the leasehold estate, and also covering certain other phases of the case. Later the court entered judgment in favor of R. G. Piper against Great Western in the sum of $4,278.42, and in favor of M. J. Mitchell and Henry Homes, Sr. in the sum of $2,109.51, which sums had been placed in the hands of the court clerk who was ordered to disburse the same as above stated.

Great Western has appealed. By stipulation and evidence issues have been reduced to a proper interpretation of the Operating Agreement above mentioned and the justification of the drilling of well No. 7 by Great Western as to R. G. Piper and the deepening of that well by Great Western below the Senora Sand as to M. J. Mitchell and Henry Homes, Sr. Piper, Mitchell and Homes had paid to Great Western, or tendered into court, their entire proportionate share of the cost of the drilling of well No. 7 and its deepening thereof and recovered judgment to the effect that the entire amount paid or tendered by Piper be returned to him and that Mitchell and Homes be reimbursed for their share of the cost of deepening well No. 7, which was a dry hole in the Senora Sand at 1,552 feet, to the Earlsboro Sand at more than 1,600 feet deep, on the theory that Piper had never agreed to the drilling of that well and that Mitchell had not agreed that it be deepened. Mitchell, Homes and Piper were allowed by the judgment to retain their proportionate share of the oil produced from well No. 7, but not required to contribute to the drilling of the well as to Piper or the deepening as to Mitchell and Homes.

Great Western has submitted two propositions as follows:

"First, the trial court erred in excusing Mitchell from the payment of his pro rata cost of the drilling of Well

No. 7 below 1552 feet and in allowing him to retain the oil produced by that well attributable to his interest.

"Second, the trial court erred in excusing Piper from the payment of his pro rata cost of Well No. 7 and in allowing him to retain the oil produced by that well attributable to his interest."

We think that a correct decision of the issues presented by the above propositions depends upon the terms of the Operating Agreement by which the Great Western agreed to operate the lease. We deem it necessary to set out the pertinent portions of the Operating Agreement of October 30, 1953, which are as follows:

" * * * the second parties hereby grant and give unto first party the right and privilege and hereby designate it to be the operator of the leasehold property above described, granting and giving it complete management and control over the joint property.

"Second parties, as non-operators, shall be entitled to inspect the leasehold estate at all reasonable times and are entitled to access thereto.

"First party shall act at all times for the joint account of the parties hereto and this contract shall never be construed as constituting a partnership agreement between the parties and the liabilities of the parties hereto is limited to the provisions of this contract and the property hereinabove described.

"The contract may be terminated by either party upon 30 days written notice to the other party. Such termination to become effective on the 1st day of the succeeding calendar month at 7:00 o'clock A.M., after receipt of said notice.

"As the party in charge of the operations, first party shall have possession of the jointly owned lease and all active supervision, charge, direction and control of all operations for the drilling of wells and the producing of oil and/or gas therefrom with the understanding however, in the event either party desires to drill an additional well upon any of the properties and the other party does not agree to drill such well, the party drilling or advancing the funds to drill such well shall be entitled to receive all revenue from the sale of oil or gas from said well until he or it has received therefrom 150% of the cost of said well, including all equipment placed thereon and the income from said well shall be committed to said purpose. After receipt of said 150% said well shall be treated as any other well and all production therefrom shall be divided in the proportion of the ownership of such lease. In the event such well is a dry hole, the party drilling the same shall bear all the loss.

* * * * * *

"When it is agreed that new well or wells shall be drilled, non-operators shall pay to operator their proportionate part of the estimated cost of such new well drilled. Upon completion of said well, operator shall furnish each of non-operators a complete audit statement of the costs thereof and if any sum be due non-operators, shall transmit therewith operator's check for such amount. If any balance be due operator from non-operators on account of said new well, non-operators shall in 10 days from receipt of such statement, pay such amount due to operator.

* * * · * * *

"This agreement shall extend to and be binding upon the parties hereto, their heirs, successors and assigns."

It will be noted that the above Operating Agreement which was signed by the assignor of Mitchell and acquiesced in by Piper, was as binding upon Mitchell and Homes as if they had personally signed it. It was expressly provided that the "second party hereby grant and give unto first party the right and privilege and hereby designate it to be the operator of

the leasehold property above described, granting and giving it complete management and control over the joint property."

This quoted provision is clear. It is further provided that Great Western " * * * shall act at all times for the joint account of the parties hereto and this contract shall never be construed as constituting a partnership agreement between the parties and the liabilities of the parties hereto is limited to the provisions of this contract and the property hereinabove described." Then, it is provided that the contract may be terminated by either party upon 30 days notice.

It is further provided that Great Western, " * * * as the party in charge of the operations, * * * shall have possession of the jointly owned lease and all active supervision, charge, direction and control of all operations for the drilling of wells and the producing of oil and/or gas therefrom * * *" but that should one party desire to drill a well and the others fail to agree, such party may drill such well and be repaid from production from the well up to 150% of the cost thereof, when such well shall be treated as any other well.

When this Operating Agreement was executed wells numbers 1, 2 and 3 had been completed as producers. Great Western decided to and did drill wells numbers 4, 5 and 6 after notifying the other owners of its intention to drill them. It later drilled well No. 7 which was a dry hole in the Senora Sand at 1,552 feet. It undertook to deepen No. 7 to the Earlsboro Sand with cable tools. The result was a fishing job at considerable expense. Three of the wells already drilled were producing from the Earlsboro. The deepening cost was about $10,000. The well produced 28 barrels per day on the pump. Mitchell objected to Sand Fracing No. 7 and this treatment was not applied, despite the fact that it might have increased production.

Reverting to the first proposition to the effect that the court erred in excusing Mitchell from paying his portion of the

cost of deepening well No. 7, and in allowing him to retain his share of the oil produced after the well was deepened, we find that under the express provisions of the Operating Agreement, Mitchell and Homes had the right to refuse to agree to the drilling or deepening of this well, but thereby would have forfeited their share of production until the party drilling or deepening had been reimbursed 150% of the cost of such operations, as expressly provided by the Operating Agreement.

It will not be disputed that the court must give effect to the written contract made by the parties and is not authorized to alter the terms of such contract unless found to be illegal. The rule is announced in Anthis v. Sullivan Oil and Gas Company, 83 Okl. 86, 203 P. 187, in the fourth paragraph of the syllabus:

"The law will not make a better contract for parties than they themselves have seen fit to enter into, or alter it for the benefit of one party and to the detriment of the others; the judicial function of a court of law is to enforce a contract as it is written."

Again in J. E. Crosbie, Inc. v. King, 192 Okl. 53, 133 P.2d 543, 546, it is said in the body of the opinion in discussing the liability of the managing partner of an oil and gas lease that:

"All of the authorities are agreed that partners assume the risk of loss that comes from bad judgment. Lyons v. Stekoll, supra [186 Okl. 94, 96 P.2d 60]. All that is required of a managing partner is good faith (we treat this separately later), and reasonable skill and diligence. Gilmore on Partnership, 373, § 128. All partners share equally losses occasioned by the bad judgment of any one partner. A managing partner is not liable alone for a loss occasioned by honest error, or by bad judgment. Rowly, Modern Law of Partnership, pp. 452 and 458. See also 30 Cyc. 452, § 20."

Mitchell certainly had no right to tell Great Western that it could not drill

or deepen well No. 7. He admits that he consented that it be drilled to the Senora Sand but did not agree that it be deepened. If he had refused, he certainly would have forfeited his part in the proceeds from production until Great Western had been reimbursed 150% of the cost attributable to his interest.

Then the court allowed Mitchell and Homes to retain their share of oil produced from well No. 7 after it had been deepened. The judgment as to Mitchell and Homes certainly amounts to an alteration of the written Operating Agreement by which they were bound.

In the second proposition it is contended that it was error to excuse R. G. Piper from paying any of his share of the cost of drilling well No. 7 and in allowing him to retain his share of the oil produced from such well after it had been deepened. The Operating Agreement was not signed by Piper, but was presented to him and he refused to sign and stated that it was not his practice to sign such agreements. However, he knew the terms of the agreement and by his words and actions agreed that Great Western operate the lease. He paid invoices for operating expenses which were presented to him for his share of such expenses as to wells 4, 5 and 6. When Great Western advised him of its plan to drill five additional wells after it took over operations, he agreed to participate in the expenses of drilling such wells and promptly paid his share of the cost. In a letter to Great Western he stated that he was not a "silent partner." He paid part of his share of deepening well No. 7 except $1,700 which was tendered in to court prior to suit and at no time refused to participate in the operations. We think he was clearly bound by the Operating Agreement despite the fact that he refused to sign it. In answer to questions by the court, R. G. Piper testified as follows:

"By the Court: Q. Just suppose that it came in a two hundred barrel well, even though you know that it couldn't, would you have participated? That was the question. A. Well, I guess, you would have to, Judge.

"By Mr. Trice: That is all. A. We would have had to stay in.

"Q. You would have been glad to stay in, wouldn't you? A. Yes, that is right. But, geologically, it is impossible that the thing could have happened. I will qualify it that way."

The above indicates that had No. 7 been a good producer, Piper would have paid his part of the cost of drilling and deepening without question.

There is only a single suggestion that Great Western acted in bad faith in operating the lease. It had executed a note for $65,000 to the First National Bank of Dallas, Texas, with a mortgage upon the lease as security. M. J. Mitchell testified that an employee of Great Western decided to drill well No. 7 to the Senora Sand in order to increase Great Western's bank loan. The record shows that this loan at the time of trial had been reduced to slightly over $30,000.

In its findings the trial court did find that there was no justification for drilling well No. 7, and gave Piper judgment for his entire share of the cost. He gave Mitchell judgment for his share of the cost of deepening the well when it was a dry hole in the Senora Sand. The court made no finding of bad faith on the part of Great Western. The trial court apparently felt the Operating Agreement and its terms were not of controlling importance.

Defendants in error appear to have disregarded the contentions of Great Western and submit two propositions which tend to support a different theory and ignore the Operating Agreement. They cite cases based upon the general law applicable to joint adventurers and partnerships.

Great Western owned a one-half interest in the lease involved and was bound to pay one-half the cost of drilling No. 7 and in deepening it. This fact alone negatives bad faith. It did secure a small producer in No. 7, and Piper admitted that had pro-

**800**

duction been better he would have paid his part of the costs.

Mitchell admitted that he consented to the drilling of No. 7, but not to its deepening. Under the express terms of the written agreement he could consent or not as he saw fit, but if he refused Great Western could drill and Mitchell would not have participated in the production until Great Western had received 150% of its cost. Mitchell had no right to prevent the drilling or deepening of the well. He, along with Piper, has accepted his share of the production, but under the judgment of the trial court, they were not required to share the cost at all.

The geological testimony is conflicting. In the absence of the Operating Agreement it might be reasonably contended that the Great Western did not act in good faith. It admits that it made a mistake in drilling No. 7, but the evidence shows that such mistakes are common in the oil business and do not prove bad faith.

K. B. Nowels was made the agent of Piper to represent Piper in approving locations of wells. Nowels was a geologist. Piper received notice dated December 17, 1953, that Great Western was to drill well No. 7. Piper asked Nowels to approve the location. Nowels testified that he tried to see Gauntt of the Great Western at Ada, but was unable to see him. On the failure of Nowels to find Gauntt at the Ada office, Piper bases his failure to approve or disapprove the location of that well. Under the terms of the Operating Agreement and under the law Piper and Mitchell had remedies available if Great Western had been acting in bad faith. They apparently decided to sit idly by and see the result so that they could participate if the well paid well, and then complain in this action if the profits were small.

When we consider the explicit authority granted to Great Western by the Operating Agreement and the oral testimony, we are forced to the conclusion that the judgment is clearly against the weight of the evidence and contrary to the applicable law.

The judgment is reversed with directions to render judgment for Great Western for the balance due it by M. J. Mitchell and Henry Homes, Sr. for their proportionate share and the Estate of R. G. Piper for its share of the cost of drilling and deepening well No. 7.

WELCH, C. J., CORN, V. C. J., and JOHNSON and WILLIAMS, JJ., concur.

DAVISON, BLACKBIRD, JACKSON and CARLILE, JJ., dissent.