C. R. COLPITT et al., Plaintiffs in Error,

v.

SKELLY OIL COMPANY, a corporation, Defendant in Error.

No. 43240.

Supreme Court of Oklahoma.

Jan. 25, 1972.

Rehearing Denied Aug. 1, 1972.

Erwin & Erwin, Chandler, for plaintiffs in error.

William A. Vassar, Chandler, Phillip E. Tibey, Sam C. Oliver, Tulsa, for defendant in error.

LAVENDER, Justice:

This appeal, by the plaintiffs in the district court, C. R. Colpitt and others, involves the action of the defendant in error, Skelly Oil Company, while serving as the designated unit operator of a waterflood unit known as the "Sporn Unit" in Lincoln County, Oklahoma, in acquiring, by assignment, a producing oil and gas lease covering an 80-acre tract of land adjoining the "unit area." That tract of land is referred to herein as the Hollowell tract.

The Sporn Unit was organized, and was created by order of the Corporation Commission of the State of Oklahoma, in September of 1958, pursuant to the statutes now appearing as 52 O.S.1961, §§ 287.1 through 287.15, for the unitized management, operation and further development, by various means including secondary recovery operations, of the Lower Skinner Sand underlying the "unit area" in accordance with the "Plan of Unitization" submitted to the Corporation Commission. The "unit area" is clearly identified on a plat attached to, and made a part of the governing plan of unitization. Under the plan of unitization, each "lessee" of a tract included in the unit area (as that term is defined in the plan of unitization) was allocated a "tract participation," in percentages, in the production from the Lower Skinner Sand within the unit area. The plan of unitization sets forth in considerable detail the rights of the "lessees" and the duties of the unit operator. Skelly and these plaintiffs (or the predecessor in in-

terest of two of them) were some of the "lessees" who signed the plan of unitization.

By agreement of the unit lessees, operations under the plan of unitization commenced on December 1, 1958, and Skelly served as a unit operator from then until June 1, 1967, when by vote of the unit lessees, Thomas N. Berry & Company (one of the plaintiffs in the case) became the unit operator. Berry was still serving as the unit operator at the time of the trial.

Under date of April 13, 1962, Skelly acquired from an intermediate assignee, an oil and gas lease, dated October 13, 1958, covering the Hollowell tract upon which a well had been completed on August 15, 1960, in the Lower Skinner Sand, with a production of approximately two barrels of oil per day. Skelly was still operating this lease and producing oil therefrom (about 50 barrels per day) at the time of the trial. There is no evidence from which it could be inferred that Skelly used any funds or other assets of the unit in the acquisition of this lease.

At the time the Sporn Unit plan of unitization was put into effect (December 1, 1958), there were 46 producing wells in the unit area. Apparently, all of them had been completed in the Lower Skinner Sand. Between that time and the middle of the spring of 1959 (about a year before the well on the Hollowell tract was completed), one of the producing wells was converted into a water-supply well, and 21 of them were converted into input or injection wells. Only one additional well was drilled in the unit area. It was completed, as a small producer, in the Lower Skinner Sand in March of 1961, about seven months after the completion of the well on the Hollowell tract. One other producing well in the unit area was converted into an input or injection well. That conversion was made in September of 1962, about five months after Skelly acquired the lease and well on the Hollowell tract, and involved a well on the 10-acre tract imme-

diately east of the additional well just mentioned, which was about a mile southeast of the well on the Hollowell tract, with three unit producing wells between them.

There were no input or injection wells in the vicinity of the Hollowell tract, affecting the Lower Skinner Sand, other than those in the unit area of the Sporn Unit. An expert witness for the plaintiffs testified that the records of the Corporation Commission showed that, at the time Skelly acquired the Hollowell lease, the production of oil therefrom was, and had been, averaging between two and five barrels per day, and that, a number of months after Skelly acquired the Hollowell lease, the production of oil from the well thereon, right along with the production of oil from the wells in the unit area (as disclosed by Skelly's monthly operating reports to the unit lessees), began to increase, continued to increase for several years, then started to decrease, and was still decreasing at the time of the trial as well as at the time Berry became the unit operator. He also testified that such pattern of increase and decrease was normal in waterflood operations; that, at the time of the trial, the well on the Hollowell tract was producing about 50 barrels of oil per day; that, in the circumstances, the increase in production from the well on the Holowell tract would have to be attributed to the waterflood operations in the unit area; and that, without those operations, the well on the Hollowell tract never would have produced more than four or five barrels of oil per day.

Upon behalf of each plaintiff, the plaintiffs' petition sought to establish a beneficial interest in that lease, equal in proportion to that plaintiff's allocated "tract participation" in the production from wells in the unit area under the plan of unitization, and to require Skelly to account to each plaintiff for the same proportion of seven-eighths of all oil produced from the well on that tract between April 13, 1962, when Skelly acquired the producing lease

on that tract, and June 1, 1967, when Skelly ceased to be the unit operator.

At the close of the plaintiffs' evidence, the trial court sustained Skelly's general demurrer thereto and dismissed the plaintiffs' action. After the overruling of their motion for a new trial, the plaintiffs appealed to this court, on the original record.

On appeal, the plaintiffs base their claim of error in such action of the trial court upon an argument to the effect that the "lessees" of tracts of land within such a unit area are tenants in common and/or parties to a joint venture and, as such, stand in a fiduciary relation to each other, with the one that is the operator of the unit also standing in a position in the nature of trustee for all of the unit "lessees;" and that, therefore, the operator of the unit cannot profit from its position at the expense of the other unit "lessees," and is required to account to them for their shares of all profits accruing to the unit, including those accruing from the purchase and operation of an adjoining lease affected by the unit operations and operated jointly with the unit leases.

Except with respect to Skelly's acquisition of the lease on the Hollowell tract with a well thereon producing oil from the Lower Skinner Sand (allegedly by fraud and overreaching on its part) and treating that lease and the production thereunder as its own separate property (rather than the property of the unit), the plaintiffs' make no complaint concerning Skelly's stewardship as the unit operator.

It is rather obvious that the real basis of the plaintiffs' complaint against Skelly is that the well on the Hollowell tract (and Skelly) benefitted greatly from the waterflood operations in the unit area of the Sporn Unit while Skelly was the operator of the unit and the holder of the lease on that tract. However, there is no evidence from which it could reasonably be inferred that the taking of oil from the well on the Hollowell tract, during that time, adversely affected the amount of oil produced, or recoverable, from the wells in the unit area.

The only evidence at all on that point is contained in an order of the Corporation Commission of the State of Oklahoma, introduced by the plaintiffs, to show that Skelly had obtained an order allowing it to produce the well on the Hollowell tract at the rate of 150 barrels of oil per day. That order, dated September 1, 1964, is based in part upon a finding by the Commission to the effect that there were no wells in the Lower Skinner Sand north of the Hollowell tract and that the oil being waterflooded northward in that sand from the unit area into that tract would be wasted unless Skelly be authorized to produce its well on the Hollowell tract at its most efficient rate, but, in no event, exceeding 150 barrels of oil per day.

We find no fault with the general principles of law, relied upon by the plaintiffs, concerning the fiduciary relationship between tenants in common and between the parties to a joint venture, or the position of the operator of a unit created under the provisions of the above-cited statutes.

However, regardless of how the relationships between the various unit lessees and between the one designated as the operator of such a unit and the other unit lessees might be characterized, those relationships arise out of, and are based upon, a written contract—in this instance designated as the "pla n of unitization"—entered into between a sufficient number of unit lessees, and approved by the Corporation Commission. And, in this instance, the plaintiffs herein, or their predecessors in interest as lessees, as well as Skelly, were signatories to the contract.

In British American Oil Producing Company v. Midway Oil Company et al. (1938), 183 Okl. 475, 82 P.2d 1049, this court held, in the first paragraph of its syllabus:

"Where the business relationship between competent parties is purely contractual, based upon a written contract, complete as to detail, and free from ambiguity, and there is no claim of fraud, overreaching, or other illegality in the contract, the rights and liabilities of the

parties are measured and fixed by the contract."

Although that case did not involve a unit organization such as the one involved herein, that principal of law is applicable herein.

In that case, Midway's predecessor in interest, Victor Oil Company entered into a written contract with British American, in which a specifically-described territory in Oklahoma City, in which Victor owned a number of undeveloped oil and gas leases, was identified as the "development area" referred to therein. In order to obtain a city permit to drill a well in any block within the area, it was necessary to have oil and gas leases covering more than fifty per cent of the lots in that block. The contract was quite detailed, but, basically, it was agreed that Victor would assign to British American a one-half interest in all of the leases it then held in the development area and in any other leases it might obtain on lots within that area, and that British American would drill wells in such blocks within the area as to which leases were held, or acquired, on a sufficient number of lots therein, and operate such wells, with all profits therefrom to be divided on a fifty-fifty basis. It was also agreed that British American would aid in the acquisition of leases in the development area, at the cost of Victor, to complete the required percentage of lots in a block, and drill wells in those blocks and operate them, with each party to have a one-half interest in those leases and in any profits therefrom. Those provisions of the contract were carried out. The contract was completely silent concerning leases or activities outside the specified development area.

During the course of development within the specified area, British American, using its own funds, purchased two oil and gas leases covering lands adjoining the development area and completed producing wells thereon.

On the theory of fiduciary relationship between the parties to the contract (as in the present case), Midway sought, and obtained, a judgment which, in essence, was the same as the one sought by the plaintiffs in the present case. Pointing out that the contract specifically related to a definitely described territory and did not bind either party in any way as to any territory or transaction outside that territory, this court reversed that judgment with directions to enter judgment for British American on that phase of the case.

In the present case, the plaintiffs do not point to, and we do not find, any provision in the plan of unitization, the unitization statutes, or the order of the Corporation Commission creating this unit, under which the holders of an oil and gas lease covering land within the unit area would, as such a lessee, be entitled to any interest whatsoever, beneficial or otherwise, in an oil and gas lease covering land not within the unit area which might be acquired by any other unit lessee or by the unit operator, or in any production from a well or wells on land outside the unit area.

According to the 1951 statute now appearing as 52 O.S.1961 § 287.8, a unit created under that 1951 act, as the Sporn Unit was, is "a body politic and corporate." The purpose of this particular body politic and corporate, according to the plan of unitization approved by the Corporation Commission, is to supervise, manage and conduct the further development and operation of the "unit area" defined therein for the production of oil and gas from the Lower Skinner Sand. The corporate purposes do not include the acquisition of oil and gas leases, or the production of oil or gas outside the prescribed "unit area."

Even if such a unit organization could be treated as a joint venture, the particular transactions involved herein, would not be within the scope of the enterprise.

There is evidence that, under date of October 15, 1956, during negotiations concerning the formation of this unit, Skelly submitted to all interested parties, copies of an isopach of the Lower Skinner Sand in this general area, prepared by Skelly and

United States Geologic Survey, for approval before doing necessary planimeter work, which indicated very little of that sand under the Hollowell tract; and that, at a meeting of the Sporn Field Operators Committee held on June 5, 1957, one of the plaintiffs herein who, with other plaintiffs or their predecessors in interest, held an oil and gas lease on the Hollowell tract, announced that the term of that lease would expire on June 9, 1957, could not be kept in force by the payment of compensatory royalty as they had been doing, and that they did not plan to obtain a renewal lease on this tract. However, there is no evidence from which it could reasonably be inferred that, at the time the plan of unitization was finalized with the Hollowell tract being deleted, by vote of the participating lessees, from the unit area, Skelly had any intention of obtaining, or acquiring, an oil and gas lease covering the Hollowell tract. Likewise, there is no evidence from which it could reasonably be inferred that Skelly, as the unit operator, operated the unit any differently after acquiring such a lease than it had operated the unit prior to acquiring the lease. Nor is there any evidence from which it could reasonably be inferred that Skelly operated the Hollowell lease and the unit leases as a combined operation at the expense of the unit organization or unit lessees. One of Berry's supervisory employees who supervised the unit operations after Berry became the unit operator testified that Berry made no changes and even continued to inject water into the input wells at approximately the same rate per day that Skelly did while it was the unit operator.

The plaintiffs' allegations of fraud and overreaching on the part of Skelly are not supported by the evidence. They did not allege, and do not claim, any other illegality in the lease contract, or any illegality in the plan of unitization under which they claim an interest in the Hollowell lease and the production therefrom.

The plaintiffs argue that Rex Oil Refining, Inc. v. Shirvan et al. (1967), Okl., 443 P.2d 82, is controlling herein. There is nothing in the record on appeal to indicate that the Hollowell tract was ever brought into the unit area of the Sporn Unit, or was ever included, with any land within the unit area of the Sporn Unit, as a well-spacing unit established by order of the Corporation Commission, so as to affect, in any way, any of the unit lessees' respective interests in oil or gas produced from any well or wells within the unit area. This, by itself, is sufficient to distinguish the situation involved in this case from that involved in the Rex case. The Rex case is not in point.

No useful purpose would be served by discussing any of the other cases cited by the plaintiffs. They concern the general principles of law as to the relationship between cotenants with respect to property held in cotenancy, or the relationship between joint venturers with respect to transactions within the scope of the enterprise, or the relationship between a body politic and corporate created under the provisions of the above-cited unitization statutes and those entitled to share in the unit's production as applied to such production.

The judgment is affirmed.

DAVISON, V. C. J., and WILLIAMS, JACKSON, IRWIN, HODGES and McINERNEY, JJ., concur.

BARNES, J., dissents.

BERRY, C. J., having certified his disqualification in this matter, did not participate in its determination.