TENNECO OIL COMPANY, a Delaware Corporation, Plaintiff,

v.

Richard D. BOGERT; Bogert Oil Company, an Oklahoma corporation, Buck Drilling & Exploration Company, an unincorporated association; Buck Exploration, an unincorporated association; C. Paul Buck, d/b/a Buck Exploration; Irene P. Buck, d/b/a Buck Exploration; and Richard D. Buck, d/b/a Buck Drilling & Exploration Company, Defendants.

No. CIV 85–1900–B.

United States District Court, W.D. Oklahoma.

March 18, 1986.

H.B. Watson, Jr., and Stephen R. Pitcock, of Watson & McKenzie, Oklahoma City, Okl., for plaintiff.

James A. Kirk and James Wm. Murray, III, of Kirk & Chaney, Oklahoma City, Okl., for defendants Buck Drilling & Exploration Co., Buck Exploration, C. Paul Buck, d/b/a Buck Exploration and Irene P. Buck, d/b/a Buck Exploration.

Clifford A. Wright, of Wright, Johnson & Winterstein, Inc., Oklahoma City, Okl., for defendants Richard D. Bogert and Bogert Oil Co.

Douglas Eason, of Fuller, Tubb & Pomeroy, Oklahoma City, Okl., for defendant Richard D. Buck, d/b/a Buck Drilling & Exploration Co.

### MEMORANDUM OPINION AND ORDER GRANTING SUMMARY JUDGMENT

BOHANON, District Judge.

This matter comes now before the court upon two motions for dismissal pursuant to Fed.R.Civ.P. 12(b)(6), for failure to state a claim upon which relief can be granted, filed by the defendants Richard D. Bogert and Bogert Oil Company (hereinafter collectively referred to as "Bogert"), and by the defendants Buck Drilling and Exploration Company, Buck Exploration, C. Paul Buck and Irene P. Buck (hereinafter collectively referred to as "Buck"). Inasmuch as defendants in connection with their motions have presented matters outside the pleadings which the court has not excluded from consideration, the motions shall be treated as motions for summary judgment and disposed of as provided by Fed.R.Civ.P. 12(b) and 56. Upon due consideration, the motions shall be sustained.

The entry of summary judgment is appropriate only when "the pleadings, deposi-

tions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "In determining whether summary judgment is proper, a court ordinarily must look at the record in the light most favorable to the party opposing the motion, drawing all inferences most favorable to that party." *Harlow v. Fitzgerald,* 457 U.S. 800, 816 n. 26, 102 S.Ct. 2727, 2737 n. 26, 73 L.Ed.2d 396 (1982); *Norton v. Liddel,* 620 F.2d 1375 (10th Cir.1980). Giving the plaintiff Tenneco Oil Company (hereinafter "Tenneco") the benefit of the inferences from all the matters presently in the record, the material facts of this case are as follows.

This dispute involves adjoining tracts of mineral properties in Blaine County, Oklahoma, namely, Section 3, Township 18 North, Range 10 West (hereinafter "Section 3") and Section 4, Township 18 North, Range 10 West (hereinafter "Section 4"). By various orders of the Corporation Commission of the State of Oklahoma, Section 4 was designated a single 640 acre drilling and spacing unit for the production of gas and gas condensate. By further orders, the Corporation Commission force pooled five common sources of supply under Section 4 and designated Buck to operate the unit well.

In August of 1973, Buck commenced drilling the Pavlu No. 1–4 well in the southwest quarter of Section 4, having obtained a location exception from the Corporation Commission. On October 22, 1973, Buck and Tenneco executed an operating agreement for Section 4. Exhibit "A" to that agreement indicates that at the time of the agreement Tenneco owned 75.65841 percent of the working interest in oil and gas leases covering Section 4 and Buck and other parties owned the remainder.[1] The operating agreement required Buck to drill one test well, the Pavlu 1–4 well. The operating agreement also contained provisions allowing either party to drill and complete additional wells with or without the consent of the other. It expressly stated that

> The liability of the parties shall be several, not joint or collective. Each party shall be responsible only for its obligations, and shall be liable only for its proportionate share of the costs of developing and operating the Unit Area.... It is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association, or to render them liable as partners.

The Pavlu 1–4 well was completed in the Mississippi, Chester, Oswego, and Manning common sources of supply, and production from the well is comingled from these sources. Production from the well has been continuous in paying quantities to this date, so far as the court is able to determine from the record before it.

In 1974, Buck drilled another well in the west half of the southwest quarter of the northwest quarter of the adjoining Section 3 where Buck or Bogert, or both of them, own a share of the working mineral estate but Tenneco does not have any interest. Section 3 at that time was unspaced, and Tenneco does not claim that the drilling of the Section 3 well, located just 330 feet east of the western boundary of the section was in itself illegal or contrary to the rules of the Corporation Commission. The Section 3 well, named the Mehew-White No. 1, was completed as a producing gas well only in the Oswego common source of supply. Subsequent to the completion of the Mehew-White No. 1 well, Buck filed an application with the Corporation Commission to create a 640 acre drilling and spacing unit for the production of gas and gas condensate from the Oswego formation, to encompass all of Section 3. On September 12, 1974, the Commission granted this request and further granted a location exception

---

1. The record does not show that Bogert owned any interest in Section 4 at the time the joint operating agreement was executed; however, it appears to have acquired some interest subsequently.

for the Mehew-White No. 1. Tenneco asserts that this location exception is void for lack of proper notice[2] and further asserts that it did not discover the existence of the Mehew-White No. 1 well until less than two years before it brought this action (July 26, 1985).

Tenneco claims that because of its location, the Mehew-White No. 1 well has drained and continues to drain hydrocarbons from under Section 4.[3] It also asserts that Bogert and Buck knew of this drainage. The gist of Tenneco's complaint is its assertion that Buck and Bogert owed a duty to Tenneco to drill an increased density well in Section 4 in order to counteract the drainage caused by the Mehew-White No. 1. Tenneco has alleged four grounds of this duty which can be summarized as follows:

1. By virtue of its position as the operator designated by the Corporation Commission for the well in Section 4, Buck owes Tenneco a duty to operate the well in a reasonable and prudent manner.

2. By virtue of its position as the operator under the joint operating agreement executed by Buck and Tenneco, Buck owes Tenneco a fiduciary duty of good faith and fair dealing.

3. The joint operating agreement imposed upon Buck an implied duty of good faith performance.

4. By virtue of their status as cotenants in Section 4, Buck, Bogert and Tenneco stand in a relation of mutual trust and confidence giving rise to a fiduciary duty.

Before considering each of these theoretical bases of liability in detail, the court must first observe that it is obvious that several of them do not apply to Bogert. Bogert was not the operator of the Pavlu 1–4 well as the term "operator" is comprehended by any of the orders of the Corporation Commission pertinent to the issues now before this court.[4] Buck was the sole entity designated by the Commission to operate the well, and the Oklahoma Supreme Court has quite explicitly held that the Commission-conferred powers and obligations of a unit operator may not be redelegated by that operator to anyone else. *Crest Resources v. Corporation Commission*, 617 P.2d 215, 217–218 (Okla. 1980) (even though "the unit operator is free to subcontract any task that is to be performed in developing for, producing or selling oil or gas from the unitized pool ..." the "managerial acts must nonetheless continue to be carried out in the name and by the authority of the named unit operator ..."). Tenneco has not cited, and the court has been unable to find any cases which hold that a party employed by a designated unit operator to perform certain tasks related to the operation of a well thereby partakes of the designated operator's legal obligations to the non-operating interest holders.

Furthermore, the joint operating agreement executed by Buck and Tenneco names only Buck as operator, and the only mention of Bogert occurs in the final enumerated paragraph, which states simply: "Richard D. Bogert, an Independent Consulting Engineer, shall be in charge of the comple-

2. This court has serious questions about its ability to exercise jurisdiction over what appears to be a collateral attack by Tenneco on the Corporation Commission order granting the location exception. *See* Okla. Const. Art. 9 § 20; 52 O.S. § 111 (1981). However, inasmuch as Tenneco has asserted before the court that the question of voidness *vel non* of this order is not essential to its claims against Buck and Bogert, the court will not reach this issue.

3. Nonetheless Tenneco has not controverted the defendants' assertion that the Pavlu No. 1–4 well has produced hydrocarbons in excess of those produced by the Mehew-White No. 1.

4. Prior to the commencement of this action, on May 1, 1985, the Corporation Commission entered Order No. 277518 designating Tenneco operator of the Pavlu 1–4 well, citing as justification, its finding that Buck "has ceased to perform the functions of an operator ... and ... that Bogert Oil Company has actually been operating the unit well." This order and its findings in no way change the legal effect of the fact that the Commission at no time entered an order *designating* Bogert as operator of the Section 4 well.

tion of this well." The agreement nowhere states any consideration to be received by Bogert in return for services rendered, nor does it anywhere describe what obligations Bogert incurs by being "in charge of" the completion of the well. The joint operating agreement is not a contract between Tenneco and Bogert and no other contract between them has been tendered to the court. Furthermore, the language just quoted refers to "this well" in the singular and it is apparent from reading the agreement as a whole that the intended reference is to the Pavlu No. 1–4 well actually completed in the southwest quarter of Section 4. Tenneco has never claimed that this well was improperly completed; Tenneco only asserts that an *additional* well, obviously not contemplated by the language referring to Bogert, should have been drilled by Bogert and Buck.

The only one of the four theoretical bases of liability advanced by Tenneco that could possibly apply to Bogert is the one which purports to find a fiduciary duty from the mere fact of cotenancy. In support of this line of argument, Tenneco cites four Oklahoma Supreme Court cases, all of which recite some form of the following general rule:

> Cotenant owners of an estate in lands stand in a relation to each other of mutual trust and confidence, and neither will be permitted to act in hostility to the other in reference to the joint estate; and a distinct title acquired by one will ordinarily inure to the benefit of all.

*Arthur v. Coyne,* 32 Okla. 527, 122 P. 688, 689 (1912) (Syllabus by the court); *Rex Oil Refining, Inc. v. Shirvan,* 443 P.2d 82 (Okla.1967); *Ellis v. Williams,* 297 P.2d 916 (Okla.1956); *Burt v. Steigleder,* 132 Okla. 217, 270 P. 54 (1928). All of the cases relied on by Tenneco involve the ac-

quisition by a cotenant of an outstanding adverse interest in the joint estate. Such circumstances are not remotely similar to those in the present case where the question is one of drilling an increased density well, or, perhaps, sharing information about drainage, not acquiring adverse title. The cases cited by Tenneco are not pertinent to this case and provide no support for its attempt to create a fiduciary duty to drill an additional well or share information.[5]

■ What really seems to lie at the heart of Tenneco's argument is the fact that Buck and Bogert were cotenants of Tenneco who knew that a well in an adjoining drilling unit was draining hydrocarbons from under the joint estate. Yet it is not clear what rule Tenneco would have the court adopt to remedy its discomfort about this situation. A rule of law that says a cotenant in an oil or gas estate who knows of drainage from under the joint estate has an affirmative duty to inform his fellow cotenants or take compensatory action on their behalf is simply without foundation or parallel in the existing law. As the Tenth Circuit Court of Appeals has plainly stated in a petroleum case arising in Oklahoma: "There is no trust relationship between cotenants as such—one is not the agent of the other." *Britton v. Green,* 325 F.2d 377, 383 (1963).

Tenneco has failed to establish that it has a claim upon which relief may be granted against Buck or Bogert based solely on the fact that these defendants are its cotenants. Since Tenneco's other theories of relief have previously been found inapplicable to Bogert, summary judgment and dismissal of the complaint in favor of Bogert are clearly appropriate. As to Buck, the remaining three theories advanced by Tenneco must be examined in more detail.

**5.** It is relevant to note that in Oklahoma a landowner has no absolute right or title to oil and gas which may permeate the strata underlying his property but only an "exclusive right, subject to legislative control against waste and the like, to erect structures on the surface of [the] land, and explore therefor by drilling wells through the underlying strata, and to take therefrom and reduce to possession, and thus acquire absolute title as personal property to such as might be found and obtained thereby." *Rich v. Doneghey,* 71 Okla. 204, 177 P. 86 (1918). In the present case, therefore, the oil and gas under Section 4 formed no part of the estate owned jointly by the parties.

■ There is no dispute that Buck was the designated operator of the Pavlu 1–4 well during the period in question under the joint operating agreement. Tenneco asserts that as a consequence of this position, Buck owed it a fiduciary duty to act in good faith. Tenneco cites the same *Britton v. Green* case just quoted as supporting its position.

That opinion, after the previously-quoted general statement denying the existence of a trust relationship between cotenants as such, goes on to state:

[Cotenants] undoubtedly may, by their separate agreements, employ an operator to possess and manage the cotenancy, without creating a trust relationship between themselves and the operating agency.... But when, as here, co-tenants undertake to designate a co-tenant as operating agent, *to exploit the cotenancy for their mutual profit*, they become co-adventurers in the enterprise, and stand in a fiducial relationship to each other and to the operating agent.... As operating agent, the co-tenant assumed to act for and on behalf of his co-tenants, and he is thus the trustee for his co-tenants and co-adventurers.

*Id.* (citations omitted; emphasis added). It is important to note that *Britton* does not involve an operator designated through a forced-pooling order of the Corporation Commission pursuant to 52 O.S. § 87.1. The operator in that case, Britton, became the operator solely by virtue of a written agreement which also served as the means by which the other parties acquired their interests in the subject leases. The agreement, in pertinent part, stated:

It is further agreed that Seller shall have the right and option to purchase the oil produced from said premises and run to the credit of Purchaser. Seller will pay the posted field price in the area for such production * * *.

It is agreed that Seller shall have active charge of the operation of said leasehold estate, and that said premises shall be operated to the mutual interest of all parties hereto as economically as good business judgment will warrant. It is further agreed that the parties hereto will observe the spirit as well as the strict letter of this contract and work at all times to the mutual advantage of each other in the management and operation and development of said lease. * * *

This language clearly created an unrestricted joint venture subject to the substantive law of partnerships. *Martin v. Chapel, Wilkinson, Riggs and Abney*, 637 P.2d 81 (Okla.1981); *Stone v. First Wyoming Bank N.A., Lusk*, 625 F.2d 332 (10th Cir. 1980).

In contrast, the joint operating agreement involved in the present matter contains language, quoted *supra*, which specifically denies that the parties have any joint or collective liability and disclaims any intention on their part to create a partnership or render themselves liable as partners. Furthermore, section 5 of the agreement, describing the duties and powers of the "Operator of the Unit Area," states that Buck, as such operator, "shall conduct all operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except as such may result from gross negligence or from breach of the provisions of this agreement."

The specific and carefully detailed obligations set forth in this agreement are much different from the general statements about mutual interest or advantage contained in the agreement involved in *Britton*. It is also significant that Tenneco's complaint in this case does not allege that Buck breached any of the express provisions of the joint operating agreement, whereas the complaints in *Britton* alleged, and this same trial court found, that Britton did breach the terms of the contract there involved. Given the circumstances of the present case, the court declines to find *Britton* [6] applicable or to read

---

6. The other case Tenneco cites as support for

the general proposition that one named opera-

into the contract between these parties additional terms creating a "fiduciary" duty with respect to the drilling of an increased density well or the sharing of information. As will be noted in further discussion *infra*, this agreement clearly obligated Buck to drill only one well. To impose an obligation for drilling an additional well would require re-writing the contract bargained for and agreed to by the parties.

Even though the present joint operating agreement may be seen to create a joint venture with attendant fiduciary duties, the court is mindful that the term "fiduciary" is easily bandied-about without precision. "The scope of the transactions affected by the relation and the extent of the duties imposed are not identical in all fiduciary relations." Restatement (Second) of Trusts § 2 comment b (1959). In the case of joint ventures to develop oil and gas properties, the law is well established that the determination of the existence and extent of such duties is controlled by the terms of the agreement between the parties. *Frankfort Oil Company v. Snakard*, 279 F.2d 436 (10th Cir.1960); *Colpitt v. Skelly Oil Company*, 499 P.2d 415, 418 (Okla.1972); *Great Western Oil and Gas Company v. Mitchell*, 326 P.2d 794 (Okla. 1958); *British American Oil Producing Co. v. Midway Oil Co.*, 183 Okla. 475, 82 P.2d 1049 (1938).

In *Frankfort Oil Company v. Snakard*, involving allegations that an operator had breached a joint operating agreement by failing to drill on certain leases and breached its fiduciary duty by failing to share certain geological and geophysical information, the Tenth Circuit stated:

> The relationship so created [by the joint operating agreements] was fiduciary in character and required the utmost good faith on the part of both parties. The extent and effect of such relationship is determined by the written agreements between the parties defining and delineating the powers and rights of each. In such a situation it is presumed that they delegated all the powers they wish to confer upon each other and withheld all powers or authority not affirmatively delegated. The relationships between them are controlled by the terms of their agreements voluntarily made.

279 F.2d at 443 (footnotes omitted). The comments of the *Snakard* court with reference to the failure of the operator in that case to share certain information are of particular interest given the argument, implicit in Tenneco's position, that Buck violated the trust Tenneco placed in it and prevented Tenneco from taking corrective action by withholding the information that the Mehew-White well was draining from Section 4.

> Frankfort is said to have breached its fiduciary duty by withholding geological and geophysical information. There was no contractual obligation on Frankfort to divulge that information. As noted above, the contracts did entitle Snakard to certain information and no claim is asserted that any such information was withheld from him. Snakard's argument in this regard is a plea that we add to the contract a provision that Frankfort furnish all geological and geophysical data. We are without power to rewrite the contract for the parties.

*Id.* at 443–444.

Similarly, in the present case, the joint operating agreement guaranteed Tenneco reasonable access to "information pertain-

---

tor by a joint operating agreement has a fiduciary duty to non-operating parties, *Texas Oil & Gas Corporation v. Hawkins Oil & Gas, Inc.*, 282 Ark. 268, 668 S.W.2d 16 (1984), is also based upon the specific language of the agreement before that court. Since the text of that agreement is not quoted in the reported opinion in the case, there is no way to productively evaluate the basis of the court's decision with a view toward the present case. It is noteworthy, however, that the case dealt with a hostile acquisi-

tion of title in the subject matter of the operating agreement by the alleged operator/fiduciary, which acquisition was made possible only through the trust placed in the operator by a non-operator who thought he held the title in question. The non-operator did not, as in this case, seek to impose an affirmative duty on the operator which was not contemplated by the parties' agreement, but instead sought redress for deliberately hostile action which undermined the very basis of the agreement.

ing to the development or operation" of the Unit Area and provided that "Operator [Buck] shall, upon request, furnish each of the other parties of copies of all drilling reports, well logs, tank tables, daily guage and run tickets and reports of stock on hand at the first of each month, and shall make available samples of any cores or cuttings taken from any well on the Unit Area." The agreement also specifically grants Tenneco the right to perform an audit. Tenneco has alleged no breach of these provisions, rather it seeks to have this court give it the benefit of information, i.e., about the alleged drainage, Buck is alleged to have acquired from its operation of a different well in a different Unit Area not covered by this agreement.

Even if Buck based its decision to drill in Section 3 on information acquired through the successful drilling in Section 4, there is no reason to find that Buck breached any duty to Tenneco by failing to share that information. In *British American Oil Producing Co. v. Midway Oil Co.*, 183 Okla. 475, 82 P.2d 1049 (1938), the court dealt with an attempt to impose a constructive trust on properties acquired by an oil and gas joint venture operator outside, but immediately adjoining, the territory specified by the contract creating the venture. The non-operator complainant asserted that the operator had acquired those properties on the basis of information acquired from the development of the contract territory. The Oklahoma Supreme Court, basing its decision on the specific language of the agreement between the parties, refused to find any duty to share the benefits of such information.[7] In summarizing the basis of its decision in its syllabus to the opinion, the court stated:

1. Where the business relationship between competent parties is purely contractual, based upon a written contract, complete as to detail, and free from ambiguity, and there is no claim of fraud,

overreaching, or other illegality in the contract, the rights and liabilities of the parties are measured and fixed by the contract.

2. The courts will not make over a written legal contract, nor enlarge or diminish rights or liabilities clearly and specifically provided therein.

3. It is the duty and right of competent contracting parties, dealing together in the management of their properties, to provide their own terms as to respective duties, and when they have done so, *it will be assumed that no other duties were undertaken or other liabilities intended to be provided.*

*Id.,* 82 P.2d at 1049, 1050 (emphasis added). These statements by the highest court of the forum state of this diversity action are clearly applicable whether the duty sought to be imposed is one to share information or to drill another well.

In the present case, Section 7 of the joint operating agreement requires the operator, Buck, to drill only one test well in the specific location where the Pavlu 1–4 was drilled and to the depth to which the Pavlu 1–4 was actually drilled. Tenneco has alleged no breach of this provision. Section 11 of the agreement specifically states "Without the consent of all parties: (a) *No well shall be drilled on the Unit Area* except any well expressly provided for in this agreement and except any well drilled pursuant to the provisions of Section 12 of this agreement ..." (emphasis added). The referenced Section 12 sets forth the contractual requirements for "Operations by Less Than All Parties" and provides that *any* party or group of parties to the agreement desiring to drill a well other than the well provided for in Section 7 may do so upon giving notice as provided by this section and allowing any other party to consent to the drilling. Such drilling must be at the sole cost and risk of the consent-

---

7. The *British American* court specifically distinguished the case of *Whatley v. Cato Oil Company,* 115 S.W.2d 1205 (Tex.Civ.App.1938) for the reason that the contract in that case contained an express provision to the effect that informa- tion acquired in the development of a certain lease was to be used for the mutual benefit of the parties to the joint venture involved. 82 P.2d at 1051.

ing parties and if the well proves productive, "the well shall then be turned over to operator [Buck] and shall be operated by it at the expense and for the account of the Consenting Parties." Nonconsenting parties relinquish their interest in the new well until certain expenses apportioned to them are recovered from the well's production.

These provisions gave both Buck and Tenneco a specifically defined and limited right to drill additional wells, with or without the other's consent, but imposed no *obligation* on Buck as operator to drill any well but the Pavlu 1–4. *See Frankfort Oil Company v. Snakard,* 279 F.2d at 440–441 (interpreting similar provisions).

The court must also take judicial notice of the fact that neither Buck nor Tenneco has any authority to drill an increased density well in the unitized Section 4 unless the Corporation Commission issues an order approving the drilling. This prerequisite cannot be eliminated by any agreement between the parties nor is it in any sense waived by the Commission's designation of Buck as operator of the well drilled pursuant to its Order No. 98786 pooling the Layton, Red Fork, Mississippi Solid and Unconformity-Chester formations underlying Section 4. The court is informed by the parties that Tenneco has indeed made application for an order approving the drilling of an increased density well in Section 4, as has Buck.

Given the detailed provisions of the joint operating agreement between these parties and the legal requirements for drilling an additional well, the court can find no basis for reading into the parties' contract a fiduciary duty obligating Buck to drill an additional well simply because it had knowledge of drainage by the Mehew-White well. Both of these parties are sophisticated participants in the business of developing oil and gas properties. It cannot be presumed that they were incapable of including an express provision in their agreement to create such a duty had they intended or desired to do so. *Frankfort Oil Company v. Snakard; British American Oil Producing Co. v. Midway Oil Co.*

These same considerations also weigh against Tenneco's attempt to sever the "implied obligation of good faith inherent within every contract" from the express terms of the contract between the parties. The cases cited by Tenneco in support of this argument, *C.H. Codding & Sons v. Armour & Company,* 404 F.2d 1 (10th Cir. 1968); *Western Natural Gas Co. v. Cities Service Gas Co.,* 507 P.2d 1236 (Okla.1972), bear little factual resemblance to the present dispute. Although *Western National* deals with the subject of natural gas, the character of the dispute for which the implied obligation of good faith was invoked is not even remotely analogous to the matter at hand. *Codding,* a case dealing with the artificial insemination of cattle, involves a determination of whether a duty not included in the express terms of the contract could be implied from the contract "as construed by the conduct of the parties." 404 F.2d at 8. In the present case Tenneco has not shown or alleged any conduct by it or Buck that would indicate the parties bargained for and agreed upon an unstated obligation to drill an additional well or share unspecified information or that the drilling of such a well or the sharing of such information was essential to accomplish the purpose of the joint operating agreement. The parties in this case contracted for the drilling of one well by Buck and for the availability of specific information and absent some allegation that those terms were not complied with in good faith, or were rendered incapable of accomplishment by Buck's actions, there is no basis for finding breach of an implied obligation.

Lastly, Tenneco argues that Buck had a "prudent operator's" duty to protect Section 4 from drainage. In support of this view, Tenneco cites the following portion of *Samson Resources Company v. Corporation Commission,* 702 P.2d 19 (Okla.1985):

> We have previously held that the status of unit operator confers a duty to operate the leaseholds as a unit and to safeguard the correlative rights of the vari-

ous interest holders. Therefore, just as a mineral lessor has a right to enforce a lessee's implied covenant to develop a lease as a prudent operator, which includes a duty to protect against drainage by the lessee's other operations, an interest holder in a unitized section has a right to enforce the unit operator's duty to conduct operations as a prudent operator.

*Id.* at 23 (footnote omitted). It must be noted, however, that these comments are clearly *obiter dictum.* The issue before the court in *Samson* was whether it should assume original jurisdiction and issue a writ of prohibition to prevent the Corporation Commission from attempting to exercise jurisdiction over a dispute between parties (one of whom was the same Tenneco involved in this present suit) to a voluntary pooling agreement and a "farm out" contract. Those questions had already been resolved by the court before the quoted comment was made, and when the quoted sentences are placed in their context, they appear more as words of consolation to one of the losers in that case, Tenneco, than as an adjudication of matters properly before the court. The complete passage reads as follows:

> The lack of jurisdiction of this matter on the part of the Commission, however, does not preclude Tenneco from seeking relief in the proper forum. We have previously held that the status of unit operator confers a duty to operate the leaseholds as a unit and to safeguard the correlative rights of the various interest holders. Therefore, just as a mineral lessor has a right to enforce a lessee's implied covenant to develop a lease as a prudent operator, which includes a duty to protect against drainage by the lessee's other operations, an interest holder in a unitized section has a right to enforce the unit operator's duty to conduct operations as a prudent operator.
>
> However, the type of questions presented in an action of this nature; the *relationship of the parties; their duties; their rights and obligations; and the existence of liability for the breach of such duties*, are matters particularly within the province of the district courts. As the Commission lacks the power to entertain a suit for damages, the seeking of relief in that forum would be not efficacious.

*Id.* (emphasis added). The final paragraph of the passage reinforces the view that the *Samson* court did not intend to create a duty of prudent operation, identical to that due a mineral lessor from his lessee, which would bind any unit operator without regard to the operating agreement between the operator and the other interest owners in the unit.

Indeed, the quoted portion of the *Samson* opinion is based in part upon a questionable interpretation of one of the Oklahoma court's previous decisions. A footnote at the conclusion of the assertion that the Oklahoma court had previously held that the status of unit operator confers a duty to operate the leasehold as a unit and to safeguard the correlative rights of the various interest holders leads to a citation of *Crest Resources v. Corporation Commission,* 617 P.2d 215, 218 (Okla.1980). *Crest* unlike *Samson,* which involved no Corporation Commission designation of operator by a forced pooling order, was not a case in which there was any joint operating agreement between the parties. Instead, it concerned a mineral lessee who sought reversal of the Corporation's refusal to vacate a forced pooling order on the grounds that the operator designated by the order had "assigned" all of its rights under the order to another company. *Crest* held that such an assignment provided no grounds for vacating a Commission pooling order because it was ineffective to transfer the obligations created by the order:

> ... while the unit operator is free to subcontract any task that is to be performed in developing for, producing or selling oil or gas from the unitized pool, he *may not redelegate to anyone else* his Commission-conferred power to operate the leaseholds as a unit and to safeguard the correlative rights of the interest holders.

*Id.* at 218 (emphasis in original). It is important to note that the power to safeguard correlative rights mentioned here is a *Commission-conferred* power which cannot be involved in a case arising out of a purely voluntary pooling agreement such as that in *Samson.*

Even when the case *does* involve a forced-pooling order, it does not appear that such an order confers powers (with the attendant obligation) to protect against drainage. By a statement of policy issued May 3, 1984, the Corporation Commission announced its policy that all pooling orders relate only to the well proposed to be drilled under the order and do not determine the rights and equities as to possible increased density wells which might be drilled in the unit. It therefore appears, for example, that the original order designating Buck unit operator in Section 4 conferred upon Buck no power to protect correlative rights by drilling an increased density well. Unless and until the Oklahoma Supreme Court specifically overrules the Commission's statement of policy, it is difficult to see how a unit operator's duty to conduct operations as a prudent operator can encompass the same duty to protect against drainage which is implied in the lessor-lessee context.[8]

Furthermore, it goes without saying that the Corporation Commission may not confer more powers on an operator than it possesses or has jurisdiction to administer. The limited character of the Commission's powers to protect correlative rights is well described in the *Samson* opinion itself:

It can thus be seen that the power to protect "correlative rights" is limited by definition and by the terms of the statute under which the Commission claims jurisdiction; 52 O.S.1981 § 87.1. Under this statute the Commission properly exercises its power to protect correlative rights by the establishment of spacing units and the setting of allowable production.

This allows protection of the public interest in orderly development and production of resources and the prevention of the drilling of unnecessary wells. The setting of allowables on production insures that no one party or parties take an undue proportion of the oil and gas.

Section 87.1 provides two other avenues for the exercise of Commission jurisdiction over the public interest in correlative rights. To prevent drainage from offsetting production the Commission may allow additional well locations in a spacing unit. To prevent drainage and the concomitant waste occurring in a unit in which interest owners are not able to come to terms regarding voluntary development, the Commission is empowered, upon proper application, to order those interests pooled. This allows an orderly development of the common source of supply. Aside from the recognized power to monitor certain terms and conditions of the contract imposed on the parties through a forced pooling order, *no other powers to protect correlative rights are granted or implied by this statute.*

702 P.2d at 22–23 (emphasis added). Thus, while the replacement of an operator designated under a forced pooling order was clearly a matter within the Commission's jurisdiction in *Crest,* 617 P.2d at 217 (*"No attempted transfer of a unit operator's status is effectual unless it is done by order of the Commission and with its express sanction."* (emphasis in original)), the replacement of an operator designated under a *voluntary* pooling agreement was found to be "clearly beyond the Commission's conferred jurisdiction" in *Samson.* 702 P.2d at 23.

In the present situation, to whatever extent Tenneco seeks to adjudicate matters arising out of the Commission's designation of Buck as unit operator or obligations to

---

8. The duty of a lessee to protect the leasehold from drainage derives from the fact that the lessor, by virtue of the lease, contracts away his own right to develop the leasehold. 5 Williams & Meyers, *Oil and Gas Law* § 802.1, at 11

(1985). The situation in the present case is much different since Tenneco had as much right to petition the Corporation Commission for permission to drill an increased density well as did Buck.

protect correlative rights attendant thereto, its proper forum is clearly the Corporation Commission. And indeed this court takes notice of the fact that Tenneco and Buck are presently adjudicating several matters related to this suit before that court. Tenneco asserts, however, that what it seeks in this court are damages which are not within the jurisdiction of the Corporation Commission to award. *Samson*, 702 P.2d at 23; *Texas Oil and Gas Corporation v. Rein*, 534 P.2d 1277 (Okla.1974); *Kingwood Oil Co. v. Hall-Jones Oil Corp.*, 396 P.2d 510 (Okla.1964). Tenneco's entitlement to such damages must be found not in the powers to protect the public interest conferred by the Commission, but in the private relationship between Tenneco and Buck. This relationship, however, as previously discussed, has been defined in detail by the joint operating agreement the parties executed. Since that agreement does not oblige Buck to drill additional wells or to share information other than the specific kinds described therein, there is no basis upon which relief may be granted to Tenneco.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED that the defendants Buck Drilling and Exploration Company, Buck Exploration, C. Paul Buck and Irene P. Buck have summary judgment against the plaintiff Tenneco Oil Company.

IT IS FURTHER ORDERED that Richard D. Bogert and Bogert Oil Company have summary judgment against the plaintiff Tenneco Oil Company.

IT IS FURTHER ORDERED that the complaint of Tenneco Oil Company be dismissed with prejudice as to all defendants named herein.

IT IS FURTHER ORDERED that Tenneco Oil Company's Motion to Reconsider or, in the Alternative, Motion to Stay Proceedings, filed January 28, 1986, and all subsequent pleadings related thereto filed by any party, be stricken from the record as untimely. As all counsel should be aware, the time for a motion to reconsider comes *after* the court has rendered its decision on the record.